COMMONWEALTH *vs.* TUCKER HARRISON.

Hampden.    January 3, 1961. — March 16, 1961.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Insanity. Homicide. Practice, Criminal,* Capital case; New trial; Defendant's ability to stand trial; Examination of jurors; Exceptions: whether error harmful. *Jury and Jurors. Evidence,* Judicial discretion; Admissions and confessions; Leading question; Of bias; Opinion: expert; Hypothetical question. *Error,* Whether error harmful.

At the trial of an indictment for murder to which insanity of the defendant was a defence, there was no error in a refusal by the judge to question prospective jurors as to their belief about insane criminals.   [283]

The order in which a revolver, and evidence identifying it as involved in a homicide, were introduced at the trial of an indictment for that homicide was in the discretion of the judge.   [283]

No harm to the defendant at a criminal trial appeared in exclusion of a question asked by him of a witness which was answered by subsequent testimony of the witness.   [283]

At the close of a voir dire held during a criminal trial to determine the admissibility of an alleged confession by the defendant, it was within the judge's discretion to refuse "at this time" to recall a witness.   [284]

Evidence at a criminal trial as to the physical and mental condition of the defendant at a time when he made an alleged confession justified the admission of the confession in evidence although at that time he had suffered a bullet wound in his head and had a severe brain injury.   [284–285]

At the trial of an indictment for murder of the defendant's wife, there was no error in the admission of testimony that shortly after the commission of the crime the defendant was "angry" and "upset" and said "he shot his wife and he was not sorry for it."   [285]

No error appeared in the circumstances in asking a thirteen year old girl leading questions in the course of her testimony as a witness at the trial of an indictment against her father for murder of her mother.   [286]

It was within the discretion of the judge at a criminal trial to exclude a question to a witness as to whether he was "particularly friendly with the deputy chief of police."   [286]

The exclusion of a question to a medical expert testifying as a witness for the defendant at a murder trial involving the defence of insanity, as to whether the witness had formed an opinion "of his [the defendant's] behavior in court" during the trial, disclosed no error in view of all of the expert's extensive testimony, and that of other witnesses, as to the defendant's mental condition at the time of the crime and thereafter.   [286–287]

Commonwealth *v.* Harrison.

In a murder case involving the defence of insanity, there was on the record no merit in a contention by the defendant that the admission of an opinion of a medical expert as a witness for the Commonwealth, that the defendant was sane at the time of the crime, was prejudicial error in that the opinion was based in part on mere hearsay.   [287–290]

On the record of a murder trial, no prejudice to the defendant resulted from certain questions to expert medical witnesses for the Commonwealth as to whether the defendant was suffering from any epileptic seizure at the time of the crime, or from their negative answers thereto, where there was nothing in the case to show any such seizure at that time.   [290–291]

After an expert medical witness for the Commonwealth at a criminal trial, on the basis of facts stated in a question to him by the defendant on cross-examination, had left it that he did not have an opinion whether the defendant had had the mental capacity to make a voluntary confession at a time when he purportedly did so, there was no prejudicial error in a question on redirect examination stating the facts more fully and the witness's answer giving his opinion that the defendant had had such capacity.   [292–293]

Evidence at a murder trial of the circumstances in which the defendant shot and killed his wife in an apartment where she was living separately from him, together with a confession made by him and evidence as to his mental capacity to make it and the circumstances in which it was made, and evidence on the principal issue of the defendant's sanity at the time of the crime warranted a verdict of guilty in the first degree. [293]

Evidence respecting the mental and emotional condition of a man of low intelligence who shot and killed his wife and then shot himself in the head, inflicting severe brain injury, did not require a conclusion that he was unable to stand trial for murder and participate in his own defence some six months after the crime occurred.   [293–295]

Prejudice to the defendant in a murder case did not appear in instructions to the jury correctly stating the bearing of his mental capacity on the competence of an alleged confession made by him, although the instructions did not specifically refer to a severe brain injury suffered by him immediately before making it.   [295]

This court concluded that justice did not require a new trial in a murder case where the evidence on the principal issue, the defendant's sanity, was fully presented and the rule of *Commonwealth* v. *Rogers,* 7 Met. 500, was properly applied.   [295–297]

INDICTMENT found and returned on January 8, 1960.

The case was tried in the Superior Court before *Smith,* J.

*Justin G. Cavanaugh,* for the defendant.

*Matthew J. Ryan, Jr.,* District Attorney, (*Leonard E. Gibbons,* Assistant District Attorney with him,) for the Commonwealth.

WHITTEMORE, J.   The defendant was found guilty of murder in the first degree of his wife, Mary Harrison, without recommendation by the jury that the sentence of death be not imposed.   G. L. c. 265, § 2.   A death sentence was imposed and execution of the sentence was stayed.   The defendant filed a claim of appeal under G. L. c. 278, § 33B, with twenty-five assignments of error, of which the eighth, twenty-third, and twenty-fourth are waived.

There was evidence to show the following: The defendant and his wife were living, separately, in Springfield; the wife lived in an apartment with their two daughters (aged thirteen and twelve years at the time of trial, June, 1960), and the defendant lived in a rooming house.   On the evening of November 25, 1959, the defendant, who earlier had been drinking wine and beer, telephoned his wife and said that he was coming to the apartment.   Soon after he arrived the defendant left to buy oil for the stove.   Upon his return, sometime before 10 P.M., the defendant talked with his wife as to whether she had just been talking on the telephone with "her man."   The defendant then asked his older daughter to make up the bed in the back room for him, and when his wife objected, the defendant walked toward the door, turned, and pulled a revolver from his pocket. The defendant then said "Well, today is your last day," pushed his wife to the floor, fired three shots into her body, and then fired one shot into his head.

There was no significant conflict in the testimony of the defendant's conduct on the day of the shooting.   One of the daughters testified that the defendant fired the shots and to what he said before doing so; this was corroborated by the defendant's confession.   Ernest Woodard, an acquaintance who had been doing paper hanging in the apartment, testified that the defendant came to the apartment bringing two bottles of beer which Woodard had requested by telephone.   The wife asked the defendant if he had been drinking.   He said he had not but had lost a lot of sleep. The defendant was playing with the younger daughter who was on the couch beside her sister; the wife and the de-

fendant each said they would pay the $5 for the paper
hanging; the wife paid; there were no angry words; it
"looked like happiness to me." A restaurant keeper, William S. Orr, testified that at about 8:45 P.M. on November
25, 1959, the defendant asked him to hold his gun for him
saying "I don't know what I might do . . . I don't feel
good . . .. I might do something . . . I'll be sorry for it
after"; the defendant came back an hour later saying "I
feel better now. I'm all right" and took back the gun; he
seemed better; he appeared either drunk or sick when he
first brought the gun; "he didn't seem right." Sam Hickson testified to driving the defendant to the filling station
and back; he thought the defendant was sick; he "didn't
look like the ordinary man"; he could not say the defendant was drunk; "he acted all right." The police officers
testified that when they came to the apartment the defendant asked for a towel to wipe the blood from his face; he
said he could walk down stairs and did so with the help of
the officers. Several hours after the shooting, at the hospital, the defendant gave a detailed confession to officers.
Some weeks before the shooting the defendant's daughters
had heard him say in his wife's presence that he had a gun.
One of them heard him say he was going to use it.

The defendant did not testify. The evidence for the
Commonwealth and for the defendant showed that the defendant was of low intelligence, possibly or probably epileptic, with a history of mental or emotional disturbance,
and that in 1958 he had been committed for a period to the
Northampton State Hospital following an attack on his
wife with a hammer which resulted in two gashes on her
head. At the time of the shooting the defendant was barred
from living with his wife under the terms of a probation
order.

The chief issue tried was the defendant's sanity. The
defendant contends that the judgment should be reversed
for assigned errors and also because the defendant at the
time of the trial was unable to assist in his own defence
and, in respects to be discussed, did not have a fair trial.

### I.

The specific assignments show no prejudicial error.

Assignment 1. There was no error in denying the defendant's motion to ask each prospective juror questions as to his belief about insane criminals. Questions in addition to those prescribed by statute are permitted only in the discretion of the trial judge. *Commonwealth* v. *Taylor,* 327 Mass. 641, 647. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 334–335. *Commonwealth* v. *Geagan,* 339 Mass. 487, 504, cert. den. 361 U. S. 895.

Assignment 2. There was no error in the admission of a 38 caliber Smith and Wesson revolver. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 470. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 341. See *Commonwealth* v. *Lee,* 324 Mass. 714, 719; *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39. The order in which evidence is admitted is in the discretion of the judge. *Commonwealth* v. *Cataldo,* 326 Mass. 373, 377. Here an officer testified that he took the weapon from the couch and later turned it over to Captain McCarthy; another officer testified he had taken the weapon from the defendant and placed it on the couch; and the captain later identified the revolver as the one turned over to him by the first officer.

Assignment 3. Dr. Arthur A. Pava, called by the Commonwealth, had testified to the defendant's head wound and the operation he performed on it. An exception was taken to the exclusion of the defendant's question in cross-examination of what the physician would expect normally would happen "from this wound." Passing several grounds which sustain the exclusion of the question as and when put, it is sufficient to note that, in the course of the cross and redirect examination which followed, the question was in substance answered. The witness testified that the defendant's injury was "tantamount to . . . a frontal lobotomy," the effect of which, if surgically performed, and sometimes if the result of an injury, is to destroy an area of the brain which controls the personality, "our awareness

of right or wrong, our insight, our judgment''; lobotomies are performed to relieve pain and ''in psychiatric institutions . . . to control otherwise uncontrollable individuals . . . [so that] these people become very docile , . . apathetic . . . easily led''; he would expect after a frontal lobotomy that the patient would be considerably more placid, ''apathetic to events . . . to be unresponsive . . . emotionally quite flattened . . .; they are easily malleable''; he saw the defendant daily or oftener for the twelve or fifteen day period of the defendant's hospitalization after the operation; conversation with him was ''principally a monologue'' by the physician; the defendant became and remained in this period a ''very placid, apathetic individual'' who sat on his bed ''with no complaints, no statements, no remarks of any kind.'' It would be hard to say whether the defendant sustained ''a complete lobotomy.'' If the frontal lobe is not completely removed the patient will have ''a degree of emotions'' and may not be ''so easily led''; he had not seen the patient after his discharge.

Assignment 4. At the close of the voir dire to determine the admissibility of the defendant's confession, the defendant asked to recall Dr. Pava on the issue of the defendant's mental capacity and his traumatic shock. The judge ruled ''not at this time.'' This was within the discretion of the judge at this preliminary hearing. *Commonwealth* v. *Reagan,* 175 Mass. 335, 338. *Commonwealth* v. *Sheppard,* 313 Mass. 590, 604, cert. den. 320 U. S. 213. *Commonwealth* v. *Valcourt,* 333 Mass. 706, 710.

Assignments 5, 6, and 7. These exceptions raise the issue of the admissibility of the confession. It was made at the hospital before the operation on the defendant's head, in brief part shortly after the murder while the defendant lay on the emergency cart in the emergency room and in greater part beginning at 5:15 A.M. on November 26, the operation following on that day at about 12:45 P.M. The defendant then had a bullet in his head and a severe brain injury. However, according to the police officer's testimony he understood the inquiries and gave understandable

answers. The substance of the answers was written on a typewriter by an officer present, and the resulting account was read to the defendant in the presence of a nurse. Several times during the reading the defendant was asked to repeat what had been read to him and he did so "word for word." The defendant then signed the statement. The essence of the confession was at the first brief interview. "I asked him . . . his name . . . and he told me 'Tucker Harrison.' I asked him what happened at the apartment and he said, 'I shot her.' He said, 'She was talking to her man on the telephone and I shot her.' " It was not error to admit the confession. On the testimony of the officer the defendant's physical and mental condition "was not such as to deprive him of the faculty of consciousness of the physical acts performed by him, of the power to retain them in his memory, or of the capacity to state them with reasonable accuracy." *Commonwealth* v. *Sheppard,* 313 Mass. 590, 604–605. *Commonwealth* v. *Lundin,* 326 Mass. 551, 555. See *Commonwealth* v. *Chance,* 174 Mass. 245, 249. If the defendant was then "easily malleable" and unconcerned for his fate, there was the risk that he would say whatever was suggested to him. The testimony, however, tended to show that the questions were not unduly leading.[1]

Assignment 9. A nurse was allowed to testify that in the hospital room before the officers came, the defendant was "angry," "upset," and said "he shot his wife and he was not sorry for it." This it appears was the substance of what was said and was admissible. See assignments 5 to 7, *supra.* It is immaterial that the witness's first answer, when objection was made, was objectionable ("he said what he had done"). See *Commonwealth* v. *Taylor,* 327 Mass. 641, 649. As to the characterizations of the defendant's emotions, see *Kane* v. *Fields Corner Grille, Inc.* 341 Mass. 640, 647.

---

[1] "I was asking him questions and he was answering. . . . I asked him if he worked that day and where he had spent the day, and what time he went over to his wife's apartment, and who was there, and what happened. Questions of that nature."

Assignment 10. In the circumstances there was no error in asking the defendant's thirteen year old daughter leading questions. The witness was young and under strain. She had read a statement which she said was true, but did not respond to nonleading questions. *Commonwealth* v. *Dorr,* 216 Mass. 314, 318. *Guiffre* v. *Carapezza,* 298 Mass. 458, 460. *Commonwealth* v. *Simpson,* 300 Mass. 45, 51, cert. den. 304 U. S. 565.

Assignment 11. There was no error in excluding the question to the restaurant proprietor who had had temporary custody of the gun on November 25, "You are particularly friendly with the deputy chief of police?" The claim of bias was immaterial for the deputy chief was not a party. The defendant in the circumstances cannot invoke the rule that reasonable cross-examination to show bias is a matter of right. See, for this rule, *Commonwealth* v. *Russ,* 232 Mass. 58, 79. Much is to be left to the discretion of the judge in testing bias. *Commonwealth* v. *Homer,* 235 Mass. 526, 537. *Commonwealth* v. *Shea,* 323 Mass. 406, 417. See *Commonwealth* v. *Sansone,* 252 Mass. 71, 75.

Assignment 12. Dr. Calvert Stein, a witness for the defendant, testified to his examinations of the defendant and his inspection of the 1958 and 1960 medical and psychiatric records at the Northampton State Hospital showing the defendant's history, and that he had observed the defendant for two days in court. The exception arose on the exclusion of the question, "Were you able to form any opinion based on reasonable medical certainty of his behavior in court these past two days?" The judge construed the question as addressed to "his condition now," and ruled that the issue was whether the defendant was sane at the time of the killing. The witness then testified at length on direct and cross-examination that in his opinion the defendant at the time of the killing did not know the difference between right and wrong and acted on irresistible impulse.

Insanity after the crime (*Commonwealth* v. *Spencer,* 212 Mass. 438, 446–447) and at the time of trial (*Common-*

*wealth* v. *Johnson,* 188 Mass. 382, 385) may be relevant to insanity at the time of the crime.    Later in the trial there was testimony from other witnesses of the defendant's mental state at such times.    There is nothing in the exception, however, for the extensive testimony of this physician disclosed his view that the defendant at the time of trial was, and for some time had been, afflicted with a disease of the mind which was operative on November 25, 1959, to cause the shooting.

Assignments 13, 14, and 17.    Dr. Harry Goodman, superintendent of the Northampton State Hospital, testified that in his opinion the defendant was not mentally ill on November 25, 1959.    He then stated bases of his opinion.    No exception was taken.    The defendant, however, asserts prejudice (assignment 13) in that the witness testified that the basis of his opinion was "my study of him during the period at the hospital [1960], what I learned from his history, and from reports, from himself, and from witnesses on that day."

The witness also, after three intervening questions and answers, testified that he had been in court to hear most of Dr. Stein's diagnoses of the defendant and, without objection, that "from any information that I received, I can't state that he was in a depressive state" on November 25. In answer to the next question, to which an exception was taken, he said, "I do not believe that he had a manic depressive psychosis at that time."    We construe the reference to "information" to be to the bases of opinion which the witness had just given.

An opinion is not admissible which is "not grounded either upon facts observed by the witness or upon facts assumed and specified in the question or upon facts in evidence through other witnesses."    If it is "based upon facts taken on the hearsay of others out of court and not in evidence and not put in the form of a supposition in the question, [it] is not admissible in evidence.    Such an opinion . . . might . . . be founded upon facts, the truth of which could not in the nature of things be established to the satis-

faction of the jury because no competent evidence respecting them would be before the jury." Rugg, C.J., *Commonwealth* v. *Russ,* 232 Mass. 58, 74. *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 591–592. Giving full recognition to this principle, there was, for the reasons following, no prejudicial error in the references to hearsay specified in these assignments of error.

There was, as stated, no conflict in the testimony of relevant events. It was very probable that any hearsay account given to the witness had been in accordance with the evidence which included the defendant's written confession and the written statement of the defendant's daughter from which she had been examined. The absence of initial objection may reflect recognition that reference to what the witness "learned . . . from witnesses on that day" was inconsequential. In any event, ensuing extensive direct and cross-examination developed just what the witness had taken into account in forming his opinion.

Furthermore, the only real issue was irresistible impulse and its effect on the defendant's awareness of right and wrong; the defendant knew the basis of Dr. Goodman's opinion that irresistible impulse did not exist, and he used full opportunity to test the opinion and the effect of every fact in the evidence and the history which might be deemed relevant.

Dr. Goodman, with reference to the hospital records, testified that in his opinion the defendant was not mentally ill when he was at the hospital in January and February, 1960. In his view the defendant's mental illness in 1958 when he was in the hospital following the attack on his wife had no significance as to the November, 1959, happening, since, as he later explained, he ascribed the defendant's hallucinations and delusions in 1958 to the toxic effect of alcoholism; it was, he believed, a "reversible" case from which the defendant recovered. Having in mind "the records . . . [he] consulted" and his conversation with the defendant, his opinion was that the defendant, on November 25, 1959, was not suffering from irresistible impulse "because

of his awareness prior to the incident, the fact that, as far as I can see, the first time that such an irresistible impulse came upon him and in the excessive compulsive type of thing, it is usually a pattern of long standing, repeated compulsions. The individual usually has tension, anxiety, and then this builds up and he gets some relief from his anxiety by performing the act and then the tensions, anxiety of conscious [*sic*] bother him again, build up more tension, and he gets relief again, and this is a repeated pattern.'' The district attorney then asked a formal hypothetical question, which recited as assumptions the salient undisputed facts of the defendant's conduct on the evening of November 25, 1959, and the confession,[1] and concluded with these words: ''based upon your experience, your training, and your examination of this defendant, can you say, Doctor, with . . . a reasonable degree of medical certainty as to whether or not he was able to distinguish his relations with the public, his relations with people about him and the difference between right and wrong?'' The answer was ''I believe he knew right from wrong.''

On cross-examination Dr. Goodman testified, inter alia, that in his opinion the defendant was mentally ill (''insane'') in 1958; he had a personality disorder on February 17, 1960; he has a defective intelligence; a patient who has a psychosis may suffer another psychotic episode, depending on the cause; the defendant could have been subject to acute psychotic episodes; a little alcohol can bring on a psychotic episode in one suffering from psychosis; he formed his opinion as to the defendant's sanity when he got the information as to what happened at the time.

---

[1] Facts other than those stated in the hypothetical question were relevant, including the defendant's use of alcohol earlier in the day, his appearance out of the ordinary to two witnesses who saw him that evening, and the indications of insanity in 1958, of prior violent action, and of hallucinations and illusions at various times. The defendant, however, made no objection to the question, does not now argue that it was prejudicial, and did not cross-examine in respect of these facts. Whether, on objection, a reference thereto and to other evidence possibly relevant should have been included in the question or left to cross-examination lay in the discretion of the trial judge. *Commonwealth* v. *Sheppard*, 313 Mass. 590, 605–606. *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 591–592.

The reference by the witness to the Northampton State Hospital records was not objectionable. The records had been used at great length by Dr. Stein in giving his opinion; Dr. Goodman was testifying about one who had been a patient in his hospital and whose sanity had been under study; the records were available; nothing was beyond reasonable check.

On redirect examination the district attorney asked Dr. Goodman: "And regardless of when it was you formed the opinion, whether it was after you saw the report of the hospital or after you got all the information in court and assuming all the things you heard in court to be true, the confessions, and so forth, that you became aware of and the statements by the nurses and so forth, what is your opinion at this time as to his condition on November 25 of 1959 as to his knowing the difference between right and wrong?" The answer, subject to exception (assignment 17), was: "I believe he knew the difference between right and wrong." Q. "And the same question, Doctor, I directed to you whether or not at this time . . . [on] November 25, he was suffering from any irresistible impulse?" A. "I do not believe he was." It did not appear just what the witness heard in court, and such a question if the evidence is capable of more than one interpretation is improper. *Connor* v. *O'Donnell,* 230 Mass. 39, 42. The factual evidence was not in dispute, but in any event the question was intended, we think, and it served, merely to supplement the previous testimony; it asked, in effect, whether any facts had come to the attention of the witness which changed his opinion already given. It did not imply reliance by the witness on any undisclosed part of the relevant facts. In the light of the prior testimony the defendant's rights were not affected.

Assignments 15, 16, and 19. Dr. Goodman and Dr. E. Philip Freedman answered negatively to inquiries whether the defendant had an attack of epilepsy, "was in the throes of any form of epileptic seizure," on November 25, 1959. The inquiry to Dr. Goodman followed immediately the in-

quiry in respect of manic depressive psychosis (see assignment 14, above) and, by implication, was answered on the basis of the same references. Dr. Freedman answered a question which referred to the facts in a hypothetical question just put which had set out the defendant's conduct on the evening of November 25, 1959, and to "facts that the jury can find to be true" and to "anything in the record."

These inadequate and improper references did not affect the defendant's rights for, in addition to the unlikelihood of any misunderstanding (see *supra*), there was nothing the jury could have found to be true on the evidence or in any record which had any substantial tendency to show an epileptic seizure at the time of the shooting.[1] There was testimony that the defendant had had such seizures at other times and the manifestations of such seizures had been described. The undisputed testimony of what the defendant did and how he appeared was not consistent with an epileptic seizure. No witness testified that the defendant was seized by epilepsy on November 25, 1959. Dr. Stein testified that the defendant had "the tendencies and habits as a result of his seizures or as an expression of his seizures to respond to minor trifling stimulations, inconsequential, . . . these triggered off this emotional time bomb that just caused him to act out with aggression, regardless of the consequences; . . . judgment and reason were blanked out; and . . . he was unable to resist the impulses to let go"; this compulsion was operative notwithstanding some awareness of his conduct. See section II, *post.*

It was not error to allow these physicians to give opinions as to epilepsy and its manifestations.

---

[1] Counsel sought the inference from the defendant's asserted lack of recollection, that he had had a "small type of seizure" ("petit mal"). But the medical testimony relied on (from a witness who had no opinion of the defendant's state on November 25, 1959) was that in this type of seizure there would be manifestations of a brief period of unconsciousness ("they may just sit down rolling their eyes and closing the eyes and then come to and in three minutes may be absolutely clear"), which was inconsistent with the defendant's described conduct in the moments of shooting. The testimony as to complete amnesia being "quite frequent" is, we think, reasonably to be construed as related to "grand mal" seizures, but, in any event, on the evidence in any aspect, including the incontrovertible self inflicted head injury, mere absence of recollection was insufficient to prove a seizure.

Assignment 18. The defendant had asked Dr. Goodman his opinion of the defendant's capacity, following his head wound, to give a voluntary statement. The witness testified that his opinion "has to be based on what went on," he had "to know the verifications of the statements that we [*sic*] made"; the examination was left on the point that on the facts as given the physician did not have an opinion. On redirect examination, on a somewhat fuller statement of the relevant testimony including the statement that "thereafter he . . . told them what had happened and . . . signed such a statement . . . and . . . there was partial damage to the brain," the witness was asked whether he had an opinion as to the voluntariness of the confession, and what it was. The defendant excepted. The answer was that "assuming . . . that he could answer all these questions and give the information, the information being corroborated by other information, I would say that the information is acceptable and that he could, at that time, give the information that he had given." A motion to strike the answer was denied.

It was not error to allow expert testimony on a relevant mental condition, even though it was a question for the jury to answer. *Commonwealth* v. *Chapin,* 333 Mass. 610, 625, cert. den. 352 U. S. 857. The issue had been opened by the defendant with this witness. Earlier also Dr. Stein had testified to his opinion that the defendant had a cerebral concussion and that the shock of the head wound in his opinion "resulted in the blanking out of reason and judgment . . . [which] are essential to sanity. . . . [The blanking out] would be . . . certainly anywhere from twelve to seventy-two hours, as a rough guess." We assume that the question propounded was objectionable; the subject on which the expert's special knowledge and experience could be helpful was, presumably, the capacity of the defendant to make a voluntary statement. The earlier unanswered question on cross-examination had been addressed to capacity. But the witness in effect answered that question. The statement that "the information is ac-

ceptable . . . he could, at that time, give the information
. . .'' reasonably meant that it could be found that the de-
fendant had the capacity to make such a statement volun-
tarily.  The witness did not attempt to give his opinion
that the statement was voluntary.  The defendant was not
prejudiced.

Assignments 20, 21, and 22.  There was no error in deny-
ing the motions for a directed verdict and to reduce the
charge to murder in the second degree.  *Commonwealth* v.
*Vaughn,* 329 Mass. 333, 337.

Assignment 25.  This presents issues on the denial of a
motion for a new trial.  There was no error in denying the
motion for reasons stated in section II of this opinion.

## II.

We turn to the broad consideration of the case required
by G. L. c. 278, § 33E (see *Commonwealth* v. *Gricus,* 317
Mass. 403, 407), to determine whether there was any mis-
carriage of justice.

The record does not sustain the contention that the de-
fendant's head injury, or his preëxisting and continuing
mental and emotional weaknesses and illnesses, barred his
trial.  The report of two psychiatrists who examined the
defendant on June 11, 1960, shortly before the trial, acting
under G. L. c. 123, § 100A, was that he was ''not now show-
ing any overt mental symptoms . . . .  The history how-
ever is consistent with probable epileptic seizures, and we
feel that he is mildly mentally retarded as of today.  We
are of the opinion that he knows the difference between
right and wrong.''  The doctors found the defendant
''quiet, coöperative . . . and [he] fully answered all ques-
tions put to him.  He was correctly oriented in all
spheres.''  He answered, when queried, that he was in jail
because ''charged with murder.''  His ''memory today
seems very good.''  One of the two examining physicians
testified on June 15, 1960, that in his opinion the defendant
''was able to stand trial.''  The report from Dr. Goodman
in February, 1960, after the defendant had been for several

weeks in the Northampton State Hospital for observation was that the defendant was able to stand trial and not then insane.

There was other testimony that the defendant is defective in judgment and comprehension, with an I. Q. of 67, and hence, in the view of Dr. Goodman, "below border line" of 85 to 90, "a moron." There was testimony of chronic alcoholism. The experts tended to agree that in the past at least he had suffered a psychosis or mental illness, that he had been "in common parlance . . . insane"; but there was disagreement as to his state at the time of the shooting. There was some evidence of hallucinations and illusions in 1958 and while the defendant was in jail in 1960. There were substantial indications of epileptic seizures at earlier times.

The defendant in his post trial statement to the jury stated, as he had earlier, when examined, that he had no memory of events "after I brought my wife some oil." He stated to the jury also that he bought the gun "for my wife's purpose" as "somebody tried to break in the house." But the testimony of the confession was evidence, if accepted, that the defendant's memory had not been impaired.

A possible conclusion may be that the brain injury had blunted the defendant's emotional awareness of the peril of his position; that he knew he might be found guilty but did not care. A person in such state may not have the usual stimuli to fight for acquittal. But it does not follow that his life has lost all meaning; or that in relation to him punishment for a crime has lost all significance.

There were of course no precise tests to determine just what had happened to the defendant's brain. Nothing in the testimony establishes that because a "large portion" of the frontal lobe of the brain was shot away and he was very apathetic and withdrawn for fifteen days, after the operation, he had lost his personality. There was substantial evidence that he had not. He was in court and addressed the jury.

We conclude that it was not error to decide that the defendant, notwithstanding his illnesses, weaknesses and injury, was sufficiently a human being to be brought to trial, with ability, although impaired, to coöperate in his own defence. "Constitutional or other inferiority is not the test of criminal responsibility." *Commonwealth* v. *Devereaux*, 257 Mass. 391, 397.

The defendant contends that the instructions and charge in respect of the confession were prejudicial in that no mention was made of the defendant's physical condition. After the voir dire, the judge correctly instructed the jury that it would be for them to determine whether the confession was voluntary. The defendant then asked that the judge also instruct as to the relevance of the defendant's mental capacity. The judge then instructed, inter alia, "as relates to an insane person, to render his confession inadmissible, it must appear that his mental infirmities were such as to deprive him . . . of the faculty of consciousness of the physical act[s] performed by him, of his power to retain them in his memory and of his capacity to make a statement of those acts with reasonable certainty. . . . [I]f the defendant . . . was suffering from some lack of mental capacity, yet understood and was conscious of the physical acts performed by him and he had the power to retain them in his memory and the capacity to make a statement of those acts with reasonable accuracy, the confession is competent for your consideration, notwithstanding that he might lack a mental capacity to do something else. It is for you to say." This was a correct statement of the law. *Commonwealth* v. *Zelenski*, 287 Mass. 125, 129. In briefer form the instruction was repeated in the charge. Although there was no reference to the brain injury, the words and the principle were applicable. There was no need to refer to physical weakness which was irrelevant except as it brought about a mental infirmity such as to invalidate the alleged confession.

The chief issue at the trial was the defendant's sanity, and this was fully tried, both as to knowing the difference

between right and wrong, and as to irresistible impulse. *Commonwealth* v. *Rogers,* 7 Met. 500, 502. *Commonwealth* v. *Chester,* 337 Mass. 702, 711–712.

Dr. Stein testified at length that the defendant had a disturbed emotional state which "explodes irresistibly" on "insignificant provocation" and that when the defendant fired the shots "he was suffering from an irresistible emotional impulse to explode and that the question of right and wrong didn't matter."[1]  Drs. Goodman and Freedman testified to the contrary view (section I, *supra*).  It is unnecessary to refer further to the psychiatric testimony to show that the issue of sanity was fully presented.  The judge correctly stated the applicable law.[2]  The testimony of the physicians and the colloquy, set out or summarized herein, show that the rule of *Commonwealth* v. *Rogers,* 7 Met. 500, 502, reaffirmed in *Commonwealth* v. *Chester,* 337

---

[1] "THE JUDGE: . . . [D]o you say . . . that this man may have . . . known that he was doing wrong, but couldn't resist or repel the impulse to kill.  THE WITNESS:  He may have had some knowledge and was unable to resist it. . . .  I think the accumulation of his tensions was such that it didn't matter at whom he exploded.  I think he has also been suicidal and was at the time and it didn't matter who he shot or whether he shot.  THE JUDGE:  You mean he had an irresistible impulse to kill.  THE WITNESS:  To destroy. . . .  THE JUDGE: . . . You mean he had an irresistible impulse to kill, kill anybody if the impulse had seized him . . .?  THE WITNESS:  No . . . .  I think he was out to kill himself first and that the other was secondary.  That is why I placed depressive psychosis at the head of my list. . . .  [J]udgment and reason were blanked out; . . . he was unable to resist the impulses to let go. . . .  THE JUDGE:  An irresistible impulse to kill is recognized legally and medically as a form of aberration under the classification of insanity. . . .  THE WITNESS:  An obsessive, compulsive, annihilistic reaction, if you want the technical language."

[2] The charge on this subject was, in part, this:  "A man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing; a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment.  In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. . . .  The rule has been stated more succinctly in these terms:  One whose mental condition is such that he cannot distinguish between right and wrong is not responsible for his conduct.  Neither is one who has the capacity to discriminate between right and wrong but whose mind is in such a diseased condition that his reason, conscience and judgment are overwhelmed by the disease and renders him incapable of resisting and controlling an impulse which leads to the commission of a homicide.  In such a case, the homicide would not be the act of a voluntary agent, but the involuntary act of the body, without the concurrence of the mind directing it."

Mass. 702, 711–713, was applied in terms of modern psychiatric concepts and with little of the possible confusion which may result from references to differences between legal insanity and mental illness. On the evidence and under the charge, if the jury had concluded, as they could have, that the defendant was seized by an impulse to kill, which, in all substance, he was incapable of resisting, they could have found him insane. See Thirty-sixth Report of the Judicial Council (1960), Pub. Doc. 144, pp. 17–39.

The defendant is admittedly a "border line defective" with serious emotional or mental afflictions. But the Constitution and general principles of law leave to the jury as laymen the decision whether criminal capacity exists in such cases. This is not a case where we can say, as a matter of law, that the defendant was so mentally defective and afflicted that he lacked capacity to commit the crime of murder.

The statute consigns the facts as well as the law to our consideration with the power and duty exercised by a trial judge upon a motion for a new trial. *Commonwealth* v. *Cox,* 327 Mass. 609, 614. On a review of the record in all aspects of fact and law it is our conclusion that justice does not require another trial.

*Judgment affirmed.*