## COMMONWEALTH vs. JOHN SHINE.

Suffolk.   September 9, 1986. — November 26, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Evidence,* Admissions and confessions, State of mind, Judicial discretion.
*Constitutional Law,* Admissions and confessions, Waiver of constitu-
tional rights. *Waiver. Practice, Criminal,* Voluntariness of statement,
Instructions to jury, Retroactivity of judicial holding. *Homicide. Armed
Assault with Intent to Rob. Intoxication. Intent.*

In a murder case, at a voir dire to determine the admissibility of statements
made by the defendant to a plain-clothes policeman at a small public
park, evidence supported the judge's findings that the questioning was
not a custodial interrogation requiring Miranda warnings, despite the
officer's testimony that his intention, uncommunicated to the defendant,
was to take the defendant into custody should he have refused to talk
at the park. [647-649]

In a murder case, evidence at a voir dire supported the judge's finding that
certain statements made by the defendant to a plain-clothes police officer
in a public park "were made freely and voluntarily with an understanding
of the nature of the alleged statements . . . [and] without fear, threats,
coercion or force, either physical or psychological, and without promise
of reward." [649]

At a hearing in a murder case on a motion to suppress statements the
defendant had made after he had been given Miranda warnings at a
police station, there was no merit to the defendant's contentions that his
ability to make a knowing, intelligent, and voluntary waiver of his
Miranda rights was impaired by reason of his youth and limited education
or that he was tricked by police officers into making the statements.
[650-652]

On an appeal from a first degree murder conviction, this court declined to
consider the legality of a police search of the defendant's residence and
automobile and the seizure of certain items found therein, where the
defendant had failed to raise the issue by filing a motion to suppress
before trial; moreover, as the court had found no merit to the only basis
argued by the defendant for suppression, namely his claim that the
evidence had been discovered as a result of statements illegally obtained
from the defendant by police, there was no occasion for the court to
exercise its extraordinary power under G. L. c. 278, § 33E. [652-653]

Where the jury in a murder case, in response to special questions, found the
defendant guilty of murder in the first degree on the basis of deliberate
premeditation, extreme atrocity or cruelty, and felony-murder, the de-
fendant was not entitled to a new trial or entry of a verdict of a lesser
degree of guilt under G. L. c. 278, § 33E, as a result of the judge's
failure to instruct the jury to consider the defendant's intoxication at the
time of the crime in determining the defendant's specific intent, with
respect to felony-murder, as required by *Commonwealth* v. *Henson,* 394
Mass. 584, 593 (1985). [653-654]

At the trial of indictments charging murder and armed assault with intent to
rob, in which the defendant failed to raise before the trial judge the issue
of voluntary intoxication as to armed assault with intent to rob, but in
which the jury had considered and rejected the defendant's claim of
voluntary intoxication on the issues of deliberate premeditation and ex-
treme atrocity or cruelty on the murder charge, the judge's omission to
instruct the jury with respect to the effect of voluntary intoxication on
the charge of armed assault with intent to rob did not create a substantial
likelihood of a miscarriage of justice. [654-655]

At the trial of a murder case, testimony by a witness that a conversation be-
tween the defendant and a friend about the loss of a watch on the night
of the murder stuck in her mind because "[t]hey were really upset and
nervous about losing a watch that wasn't very expensive or anything,"
was admissible as a summary description of the defendant's emotional
or mental condition. [656]

The judge at the trial of a murder case did not abuse his discretion by sug-
gesting during a voir dire hearing on the admissibility of the defendant's
statements, that the prosecutor recall a witness to testify that the defendant
had been advised of his rights under G. L. c. 276, § 33A, to use the
telephone at the station within one hour for the purpose of calling his
family or an attorney. [656]

INDICTMENTS found and returned in the Superior Court De-
partment on November 14, 1983.

The cases were tried before *Robert A. Barton,* J.

*Carol A. Donovan,* Committee for Public Counsel Services,
for the defendant.

*Judy G. Zeprun,* Assistant District Attorney (*Charles M.
Campo, Jr.,* with her) for the Commonwealth.

*Charles W. Rankin,* for Massachusetts Association of Crim-
inal Defense Lawyers, amicus curiae, submitted a brief.

LIACOS, J. On November 14, 1983, a Suffolk County grand
jury returned indictments charging the defendant, John Shine,
with murder in the first degree, and with armed assault with

intent to rob. Following trial, a jury returned a verdict of guilty on each indictment. The defendant was sentenced to the Massachusetts Correctional Institution at Walpole (now Cedar Junction) for the term of his natural life on the murder conviction, and for a concurrent term of eighteen to twenty years on the conviction of armed assault with intent to rob. The defendant appeals to this court pursuant to G. L. c. 278, § 33E (1984 ed.).

The defendant raises numerous claims of error and seeks a new trial. Alternatively, he asks that we direct that the degree of guilt be reduced to murder in the second degree and armed assault. There is no ground for reversal of the conviction of murder in the first degree. The record does not warrant our ordering under § 33E either a new trial or a reduction in the degree of guilt. Additionally, we affirm the conviction of armed assault with intent to rob for the reasons stated later in this opinion.

We summarize the evidence. At approximately 2 A.M., August 27, 1983, several witnesses heard loud screaming and saw the victim, Ronald Bruce Cummings, running down a Revere street into a minipark followed by a slim, blond man. Someone was yelling, "Bobby, Bobby, where are you?" The victim's mother heard the victim calling, "Ma, Ma." She ran outside, where she saw the blond man stabbing her son. She yelled to the stabber to leave her son alone. The assailant looked at her, stabbed the victim two or three more times, and fled the scene. Shortly thereafter, Revere police officers arrived and found the victim lying in the park, bleeding profusely, with a wide long gash on his neck. Emergency medical technicians found part of a watch under the victim and placed it in the victim's pocket. The victim had been stabbed seventeen times. He died three hours later.

The defendant spent the evening before the stabbing with his girl friend, Allyson Vaczy Hoyt, and Robert Sweeney, at whose home he had been staying since August 22 or 23. That evening, the defendant tried unsuccessfully to borrow money from his girl friend. The defendant and Sweeney left Sweeney's home at 1:15 A.M. and returned between 2:15 and 2:30 A.M. Hoyt testified that the defendant did not appear to be intoxicated when he returned. He took a knife out of his back pocket and

placed it on the kitchen window sill. The defendant told
Sweeney that he had lost Sweeney's watch; Sweeney asked,
"Where did you lose it?"; the defendant answered, "Where do
you think?" Hoyt repeated Sweeney's question; the defendant
said, "Never mind." Over the defendant's objection, Hoyt tes-
tified that the conversation stood out in her mind because
Sweeney and the defendant were "really upset and nervous
about losing a watch that wasn't very expensive or anything."
About 8 A.M., Sweeney, Hoyt, and the defendant drove to the
scene of the stabbing at the minipark.

At the voir dire,[1] State trooper Lawrence Colson testified
that he was searching for evidence, including a knife, in the
minipark at approximately 8 A.M. He was dressed in plain
clothes, wearing his badge and a gun on his belt. Sweeney
approached him and asked whether he had found his watch.
Trooper Colson told Sweeney that he was a police officer; that
there had been a murder in the minipark the prior evening; and
that a watch had been found under the victim's body. Sweeney
said that he knew nothing about a murder. Pointing to Shine
sitting in the parked automobile with Hoyt, he said that he had
loaned the watch to his friend who had lost it in the park the
night before. The trooper asked Sweeney to stay where he was
so that he could speak to the defendant without Sweeney pres-
ent.

As the trooper approached, Shine stepped out of the au-
tomobile, and the trooper noticed that his height, weight, hair
color, and hair length fit witnesses' descriptions of the victim's
assailant. He also noticed blood on the defendant's sneakers.
The trooper said, "Come here, kid," and they stepped to the
rear of the automobile. Asked, "What's all over your shoes,"
the defendant answered, "Blood." Asked why he was in the

---

[1] A midtrial voir dire was conducted to determine the admissibility of
five statements made by the defendant on August 27, 1983, including one
to Trooper Lawrence Colson at the minipark at approximately 8 A.M., three
to police officers, and one to Hoyt at the Revere police station later that
day. Although defense counsel did not file a motion to suppress the defend-
ant's statements for failure to give Miranda warnings, the court, as requested
by the defendant, treated the hearing as directed both to the Miranda issue
and to the voluntariness of the defendant's statements.

park, the defendant said that he came to look for a watch which he had lost at 9:30 the night before when he had gone to the park to "cool off" after an argument with his girl friend.

Trooper Colson asked the defendant to come with him to his automobile so that Colson might ask him some questions. The defendant said, "[A]ll right," and walked toward Colson's unmarked cruiser. Later, Colson went inside a neighbor's house to call the police station. He did not tell the defendant to stay where he was; he left the defendant and Sweeney alone on the street. The defendant testified that he did not see the badge on Colson's belt, his holster, or his gun, and that he did not learn that Colson was a police officer until "just before [they] went down to the police station."

Colson did not advise the defendant of his rights or tell him he was under arrest at the minipark. Colson testified that he had not made up his mind to arrest or to take the defendant into custody at the minipark, but that he would have taken him into custody had he tried to walk away. The defendant and Sweeney both agreed to go to the Revere police station. Sweeney and the defendant's girl friend drove in Sweeney's automobile; the defendant went — unrestrained and without protest — in an unmarked police cruiser.

At the police station, the defendant was advised of his Miranda rights. He agreed to talk to the officers and signed a written waiver. At the outset of a half-hour, tape-recorded statement, Trooper Colson told the defendant that he was not under arrest and that he was free to leave at any time, although the trooper admitted at trial that he was misleading the defendant by his statements. In this first statement, the defendant described and identified the watch which he had lost the prior evening, admitted that he owned a knife which was in Sweeney's kitchen, and denied that he had stabbed Cummings. He elaborated on, but did not contradict, the statements he had made to Trooper Colson at the minipark regarding his activities the previous evening. At the end of this interview, the officers informed the defendant that he was under arrest.

The defendant then spoke with his girl friend alone, after a Revere police inspector told him that they had conflicting state-

ments from Sweeney and that, "if he wanted to help himself, now is the time to tell the truth." Hoyt asked the defendant if he did it. After twice responding, "What do you think," the defendant banged his head against the wall and said that "Bob [Sweeney] had put him up to it," that he had done it, but that he did not remember too much about it. She told the defendant to go upstairs and tell the truth.

Two hours after his first interview at the station, the defendant had an unrecorded conversation with Officer Michael Cutillo. The defendant was readvised by Officer Cutillo of his Miranda rights, but nothing in the officer's handwritten notes reflected that fact. The officer stated that the defendant signed a waiver which had been "lost in the paper work." The defendant said that he would tell the truth. The defendant then explained that he and Sweeney were out driving in Sweeney's automobile and needed money to buy gas. Seeing a man on foot who, in Sweeney's words, "look[ed] like he's an easy target," Sweeney said, "Let's roll him." The defendant got out of the automobile and followed Cummings. He came up behind Cummings and tried to reach into his pocket. The victim turned and hit him with what the defendant thought was an elbow. According to the officer's testimony, the defendant then said, "I think I stabbed him. I don't know. I blacked out." The officer then asked the defendant if he would be willing to make a statement on tape, and he agreed.

Lieutenant John MacDonald and Inspector Joseph Marshall testified that the defendant was reinformed of his Miranda rights prior to the third and final fifteen-minute conversation, but the warnings do not appear on the tape recording. The defendant repeated what he had told Officer Cutillo in the unrecorded conversation, adding that he had had two drinks and had taken two capsules of what he thought were "speed" at a bar before he and Sweeney spotted the victim. He claimed that he could not remember if he did anything after the victim elbowed him; and that the next thing he remembered was running back across the highway and getting into Sweeney's automobile. He stated that he did not recall taking a knife out of his pocket; that he did not remember how he had gotten blood

on his arm; and that he and Sweeney returned to the park the next morning to retrieve the watch for "sentimental reasons." At the end of the interview, the defendant agreed, in response to questions, that his rights had been explained to him, that he had chosen to make the statement without an attorney, and that no promises were made to him.

After the defendant's second statement to police officers at the station, Officer Cutillo obtained search warrants for Sweeney's home and automobile. After obtaining the warrants, Officer Cutillo and Lt. MacDonald went to Sweeney's house and found a black-handled folding knife and towels, newspapers, and a face cloth, all stained with blood.

1. *Admissibility of the defendant's statements at the minipark.* A. *Miranda warnings.* The defendant argues that the judge erred in admitting his statements to Trooper Colson at the minipark because he was subjected to "custodial interrogation" without being informed of his Miranda rights. The judge found that these statements were not the result of custodial interrogation. There was no error.

Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). At the time the defendant made statements to Trooper Colson at the minipark, there had been no " 'formal arrest or restraint on [defendant's] freedom of movement' of the degree associated with a formal arrest." *California* v. *Beheler,* 463 U.S. 1121, 1125 (1983), quoting *Oregon* v. *Mathiason,* 429 U.S. 492, 495 (1977). The defendant himself testified at the voir dire that he did not see Colson's holster or gun, did not see the badge on Colson's belt, and first learned that Colson was a police officer "just before [they] went down to the police station."

The defendant puts particular emphasis on Trooper Colson's testimony that the defendant was not free to leave and that he would have been taken in custody had he refused to talk at the minipark. As matter of law, however, Trooper Colson's uncommunicated feelings are irrelevant. "A policeman's unar-

ticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Berkemer* v. *McCarty,* 468 U.S. 420, 442 (1984). In that case, the United States Supreme Court rejected a claim similar to the defendant's and found that there was no "custodial interrogation," even though an officer "apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged . . ., [because he] never communicated his intention to respondent." *Id.* See *Commonwealth* v. *Podlaski,* 377 Mass. 339, 343 (1979).

As this court stated in *Commonwealth* v. *Bryant,* 390 Mass. 729, 739 n.11 (1984): "The Supreme Court has never endorsed a subjective standard of 'custody,' and other courts have explicitly rejected such a test. 'Although the officer may have an intent to make an arrest, either formed prior to, or during the questioning, this is not a factor in determining whether there is present "in-custody" questioning. It is the officer's statements and acts, the surrounding circumstances, gauged by a "reasonable man" test, which are determinative.' *Lowe* v. *United States,* 407 F.2d 1391, 1397 (9th Cir. 1969). *United States* v. *Booth,* 669 F.2d 1231, 1235 (9th Cir. 1981). We likewise adhere to an objective standard."

Questioning the defendant next to his friend's automobile where he had been sitting with his girl friend, who remained there during the conversation, is far from the "incommunicado interrogation . . . in a police-dominated atmosphere" which was the Supreme Court's concern in *Miranda, supra* at 445. The defendant was not "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." *Id.* at 457. He was questioned on a city street, a public place where passersby could "witness the interaction." *Berkemer* v. *McCarty, supra* at 438. When the officer went to a neighbor's house to call the Revere police station, he did not tell the defendant to stay where he was, and he left the defendant and his friend Sweeney alone on the street.

At the conclusion of the voir dire on the admissibility of the defendant's statements, the judge made a subsidiary finding of fact that the questions which the police asked the defendant

at the park were "natural preliminary questions designed to determine the defendant's identity and what he knew about the crime." That finding was warranted by the evidence and will not be disturbed by this court. *Commonwealth* v. *Mahnke,* 368 Mass. 662, 667 (1975), cert. denied, 425 U.S. 959 (1976). *Commonwealth* v. *Tavares,* 385 Mass. 140, 145 (1982).[2]

B. *Voluntariness of defendant's statements.* The defendant asserts that, even if he was not entitled to Miranda warnings at the minipark, his statements there must be suppressed because the Commonwealth failed to establish that they were voluntary beyond a reasonable doubt.

The defendant claims that his statements were "the product of the coercive situation in which he found himself," not the product of an intelligent exercise of free will. To support his claim, he points to his youth, limited education, and a sleepless night prior to his morning encounter with Trooper Colson. He also points to the absence of an automobile to enable him to leave the area, or a home to which he could retreat; to the trooper's words, "Come here, kid," and "harsh and accusatory" questioning. However, the defendant gave no indication at the time that he did not want to talk to Trooper Colson. According to his own testimony at the voir dire, when the trooper said that he wanted to ask him a few questions, the defendant responded, "[A]ll right." At the conclusion of the voir dire, the judge found "beyond a reasonable doubt that all statements made by this defendant that have been heard by this Court on voir dire were made freely and voluntarily with an understanding of the nature of the alleged statements. It was the product of a rational intellect without fear, threats, coercion or force, either physical or psychological, and without promise of reward." These findings are warranted by the evidence, and we shall not disturb them. *Commonwealth* v. *White,* 374 Mass. 132, 138 (1977).

---

[2] The defendant also claims that, even if this conversation with Trooper Colson was not a "custodial interrogation" under Federal law, the trooper's failure to give Miranda warnings prior to the defendant's statements at the minipark violated art. 12 of the Massachusetts Declaration of Rights. The defendant did not raise this issue at trial, and we do not consider it.

2. *Admissibility of statements at the police station.* The defendant argues that all statements he made at the police station were the direct consequence of his conversation with Trooper Colson at the minipark and therefore must be suppressed as "fruit of the poisonous tree" under *Wong Sun* v. *United States,* 371 U.S. 471 (1963), and *Commonwealth* v. *Haas,* 373 Mass. 545, 554 (1977). We need not reach this argument because the defendant's statements at the minipark were properly admitted. "The doctrine of the fruit of the poisonous tree . . . is not implicated if the tree is not poisonous." *Commonwealth* v. *Buchanan,* 384 Mass. 103, 108 (1981). Neither do we reach the defendant's "cat-out-of-the-bag" argument. See *Commonwealth* v. *Amazeen,* 375 Mass. 73, 79 (1978); *Commonwealth* v. *Haas, supra*; *Commonwealth* v. *Mahnke, supra* at 686-688. That analysis applies to "cases wherein a subsequent statement is argued as involuntary because it is the product of an earlier statement found to have been 'coerced,' or itself 'involuntary.'" *Commonwealth* v. *Watkins,* 375 Mass. 472, 481 (1978). See *Commonwealth* v. *Haas, supra.* Because we conclude that the defendant's statements at the minipark were neither coerced nor involuntary, the defendant's cat-out-of-the-bag argument is not supported by the facts.[3]

The defendant next argues that the Commonwealth has failed to sustain its burden of proving beyond a reasonable doubt that the waiver of his Miranda rights at the police station was knowing, intelligent, and voluntary. See *Commonwealth* v. *Day,* 387 Mass. 915, 920-921 (1983). He also claims that statements he made after receiving Miranda warnings were not

---

[3] The defendant argues now, but did not claim at trial, that, even if the interrogation at the minipark were noncustodial and even if the statements were voluntary, the statements were inadmissible under art. 12 of the Massachusetts Declaration of Rights. Amicus curiae, Massachusetts Association of Criminal Defense Lawyers, submitted a brief to this court which assumes that the encounter at the minipark was a custodial interrogation and urges us to hold that art. 12 requires suppression of statements made after an unwarned custodial interrogation unless the Commonwealth demonstrates that subsequent statements are not "fruit of the poisonous tree." As the argument of the amicus relies on the premise that the first discussion was a custodial interrogation, it becomes immaterial to this case.

voluntary beyond a reasonable doubt. We disagree. The judge found that the defendant was advised completely of his Miranda rights and signed a waiver form.

In reviewing a judge's determination regarding a knowing waiver of Miranda rights and voluntariness, we "grant substantial deference to the judge's ultimate conclusions and we will not reject a judge's subsidiary findings if they are warranted by the evidence." *Commonwealth* v. *Benoit,* 389 Mass. 411, 419 (1983). *Commonwealth* v. *Williams,* 388 Mass. 846, 851 (1983). See also *Commonwealth* v. *Mandile,* 397 Mass. 410, 412-413 (1986). The defendant maintains that, by wrongly telling him that he was free to leave and by not informing him that they intended to arrest him, his ability to assess his situation and to respond intelligently was impaired by his youth and limited education. But there was no evidence that the defendant was not sufficiently intelligent or educated to waive his rights or voluntarily to make a statement. To the contrary, the judge found that the defendant, at the time he made the statements to the police officers, had ten years of education, was an adult of at least average intelligence, and was familiar with Miranda rights from prior experience. Although Colson did tell the defendant that he was not under arrest at the outset of the police station interrogation, and that he was "free to leave," an admittedly misleading statement, the judge found that the police officers did not "trick" the defendant into making any statements. There was no evidence that Colson intended to deceive the defendant, or did deceive the defendant, into making statements. Cf. *Commonwealth* v. *Meehan,* 377 Mass. 552, 563 (1979), cert. denied, 445 U.S. 39 (1980); *Commonwealth* v. *Jackson,* 377 Mass. 319, 329 (1979).

The defendant further claims that his confessions were tainted by Inspector Marshall's attempt to persuade him to confess by telling him that Sweeney had given a contradictory version of the previous evening's events and that if he wanted to help himself he should tell the truth while the assistant district attorney was at the police station. The judge, observing the demeanor of the defendant on the witness stand and listening to his testimony, "disbelieve[d] the testimony of [the] defend-

ant . . . that any promises or threats were made by [Inspector] Marshall." He found that "no trickery, no threats, no assurances expressed or implied that a statement by the defendant would aid the defendant or result in a lesser sentence were given by [Inspector] Joseph Marshall. Any possible interpretation that [Inspector] Marshall's statement was an inducement to the defendant is dissipated by the fact that the defendant was thereafter given an opportunity to speak alone by his request to his girl friend, [Hoyt], after which he decided to give a further statement to the police." Warranted by the evidence, these findings cannot be disturbed by an appellate court. *Commonwealth* v. *Mahnke,* 368 Mass. 662, 667 (1975). "An officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited . . . is an assurance, express or implied, that it will aid the defense or result in a lesser sentence." (Footnotes omitted.) *Commonwealth* v. *Meehan, supra* at 564. See also *Commonwealth* v. *Mandile, supra* at 414-415.

The defendant argues that all items, including a knife, blood-stained articles, and a denim jacket seized pursuant to warrants[4] to search Sweeney's residence and automobile should have been suppressed as "fruits of the poisonous tree." The defendant filed no motion to suppress the knife, denim jacket, photographs of Sweeney's residence and automobile, or blood-stained items found in Sweeney's house. At trial, he did not object to the introduction of his jacket and stated that he had no objection to the admission of the knife or photographs of the automobile or inside of Sweeney's house. The blood-stained newspaper, towel, and facecloth were marked for identification

---

[4] Officer Cutillo testified that he had prepared an affidavit for a search warrant after the defendant's second stationhouse interrogation. The affidavit is not part of the record; there is nothing in the record to establish whether any statements of the defendant were incorporated in the detective's affidavit in support of his application for a search warrant.

but never introduced in evidence.[5] Because the defendant made no motion to suppress evidence before trial, did not seek a voir dire, or object at trial, and stated that he had no objection to introduction of several items, the question of the legality of the search is not before this court on appeal. *Commonwealth v. Connolly,* 356 Mass. 617, 624-625, cert. denied, 400 U.S. 843 (1970). Where there is an illegal search or seizure, the defendant seasonably must raise the issue by filing a motion to suppress the evidence before trial. Rule 61 of the Superior Court (1974). Additionally, there is no reason to exercise our extraordinary power under G. L. c. 278, § 33E, where, even if the issue had been raised properly at trial, the "fruit of the poisonous tree" argument fails because none of the defendant's statements to police officers at the minipark or at the station were obtained illegally, and no other defect in the search procedure has been claimed.

3. *Review pursuant to G. L. c. 278, § 33E.* A. *Jury instruction on intoxication.* The defendant asks us to exercise our powers under G. L. c. 278, § 33E, to order a new trial as to the murder conviction because the judge precluded the jury from "consider[ing] evidence of the defendant's intoxication at the time of the crime in deciding whether the Commonwealth has proved . . . specific intent beyond a reasonable doubt" when deliberating on the charge of felony-murder based on a homicide committed in the course of armed assault with intent to rob. See *Commonwealth v. Henson,* 394 Mass. 584, 593 (1985). Alternatively, the defendant asks this court to vacate the conviction of armed assault with intent to rob and to strike so much of the jury's verdict as finds him guilty on a felony-murder theory. A new trial as to the murder indictment is not warranted. The judge submitted special questions to the jury on the murder indictment. See *Commonwealth v. Licciardi,* 387 Mass. 670, 675-677 (1982). The jury found the defendant guilty of murder in the first degree on the basis of (1) deliberate premeditation, (2) extreme atrocity or cruelty, and (3) felony-

---

[5] Defense counsel objected to their admission on the grounds that they were stained with canine, not human, blood, and that nothing taken from the Sweeney residence tied "into either the victim or this defendant."

murder. The conviction on two of the three grounds of murder in the first degree is unaffected by the *Henson* rule, even though we stated in *Commonwealth* v. *Ennis, ante* 170, 175 (1986), that "*Henson* is . . . fully retroactive." We conclude that the applicability of the *Henson* rule has no bearing on the defendant's conviction of murder in the first degree because the *Henson* instruction would not apply to the jury's deliberations regarding murder committed with deliberately premeditated malice aforethought or murder committed with extreme atrocity or cruelty.[6]

The sentence for armed assault with intent to rob is concurrent with the life sentence imposed for the conviction of murder in the first degree. See *Commonwealth* v. *Wilson,* 381 Mass. 90, 123-125 (1980); *Commonwealth* v. *Hogan,* 379 Mass. 190, 194 (1979). The defendant argues, however, that this conviction should be reversed because the charge as to voluntary intoxication was in error.[7]

As to the crime of armed assault with intent to rob, *Henson* would require an instruction regarding the relevance of voluntary intoxication, if such an instruction had been requested by counsel for the defendant. In his charge to the jury, the judge stated, "Neither drunkenness nor drugs is a defense to the crime of robbery because a person can entertain and put into effect the specific intent to commit robbery even though drunk or under the influence of drugs."

The judge's instruction on the crime of armed assault with intent to rob was in error under the *Henson* rule. The defendant's failure to object to the instruction, as given, to request a proper instruction and to object to its omission by the judge requires that we disturb the rulings below only if we conclude

---

[6] The judge properly charged the jury as to the effect of voluntary intoxication on deliberate premeditation and extreme atrocity or cruelty. See *Commonwealth* v. *Gould,* 380 Mass. 672 (1980); *Commonwealth* v. *Perry,* 385 Mass. 639 (1982).

[7] There was sufficient evidence introduced at trial to raise the issue of the effect of voluntary intoxication on the defendant's ability to form the specific intent to rob necessary to find him guilty of armed assault with intent to rob.

that the error was of "a type and seriousness which should lead us to reverse in the absence of a proper exception." *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). We review this aspect of the defendant's claim of error on the armed assault indictment under the principle enunciated in *Commonwealth* v. *Freeman, supra,* because we consider, at this point, a conviction of a crime other than one of murder in the first degree. The test is whether there is a substantial risk of a miscarriage of justice. *Id.* at 564.

We consider the defendant's failure to object to be significant to our consideration of this claim of error because, although *Henson* had not been decided at the time of trial, the relevance of evidence of voluntary intoxication to the proof of specific intent under the *Henson* rule had been clearly foreshadowed by our earlier decisions. See, e.g., *Commonwealth* v. *Loretta,* 386 Mass. 794, 799-800 (1982); *Commonwealth* v. *Sheehan,* 376 Mass. 765, 773-775 (1978). The criteria for retroactive application of a common law principle, as set forth in *Commonwealth* v. *Breese,* 389 Mass. 540 (1983) (see *Commonwealth* v. *Ennis, supra* at 174), warranted the conclusion at the time of trial that evidence of voluntary intoxication should be put to the jury, on a proper instruction, as relevant to proof of specific intent to rob. Both *Breese* and the cases on which *Henson* relied were decided prior to this trial. Clearly, then, the duty fell on the defendant's counsel to raise before the trial judge the issue of voluntary intoxication as to armed assault with intent to rob.

Considering the conviction of armed assault with intent to rob under the standard of *Commonwealth* v. *Freeman, supra,* we conclude there was no substantial risk of a miscarriage of justice. The evidence of guilt, already recounted, was overwhelming. Additionally, the jury having considered, and rejected, the defendant's claim of voluntary intoxication on the issues of deliberate premeditation and extreme atrocity or cruelty on the murder charge, it is unlikely that they would have given credence to the same claim in considering the armed assault charge. The conviction of armed assault with intent to rob is affirmed.

B. *Admission of opinion testimony.* The defendant claims that the judge erred in allowing Hoyt to testify, over objection,[8] that a conversation between Sweeney and the defendant stuck out in her mind because "[t]hey were really upset and nervous about losing a watch that wasn't very expensive or anything." According to the defendant, the inference that the reported conversation indicated unusual concern over the loss of a watch is an inference to be drawn or rejected only by the jury.

Hoyt's testimony about the defendant's demeanor was admissible as a summary description of his "emotional, mental or physical condition." P.J. Liacos, Massachusetts Evidence 102 (5th ed. 1981 & Supp. 1985), citing, inter alia, *Luz* v. *Stop & Shop, Inc.,* 348 Mass. 198, 208 (1964) (driver of automobile characterized as "confused"); *Gilman* v. *Metropolitan Transit Auth.,* 345 Mass. 202, 205 (1962) (nervous condition of plaintiff described); *Commonwealth* v. *Harrison,* 342 Mass. 279, 285 (1961) (defendant described as "angry" and "upset"). There was no error in admitting the testimony.

C. *Reopening of Commonwealth's case at voir dire.* The defendant argues that he is entitled to a new trial because the judge abandoned his proper judicial role and took on the role of the Commonwealth's advocate by suggesting that the prosecutor reopen his case on voir dire to recall a witness to testify that the defendant was advised of his rights under G. L. c. 276, § 33A, to use the telephone at the station within one hour of his arrival for the purpose of calling family or an attorney. The defendant did not file a motion to suppress on the ground that he was not advised of his right to make a telephone call.

It is within the sound discretion of the judge to admit material evidence offered by a party after he has rested. *Duchesneau* v. *Jaskoviak,* 360 Mass. 730, 734 (1972). The judge did not abandon his judicial role by ensuring that evidence was presented of compliance with G. L. c. 276, § 33A.

---

[8] After Hoyt testified as to the defendant's demeanor, the defendant made an objection and a motion to strike which were overruled and denied respectively. The judge admitted her statement "for her state of mind"; he probably meant to admit it for his (defendant's) state of mind. Such a misstatement is harmless.

We have considered the entire case on the law and the evidence, pursuant to our powers under G. L. c. 278, § 33E, and we conclude that the verdict of guilty on the charge of murder in the first degree is against neither the law nor the evidence. On the defendant's conviction of murder in the first degree, the interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt. On the conviction of armed assault with intent to rob, we affirm.

*Judgments affirmed.*