Commonwealth v. Freeman.

COMMONWEALTH vs. RICHARD DENIS FREEMAN.

Middlesex.   March 6, 1967. — June 1, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Identification. Evidence,* Of identity, Admissions and confessions, Relevancy and materiality. *Practice, Criminal,* Assistance of counsel, Questioning of witness by judge, New trial.

Identification by two girls of a man seated at a table in the front office of a police station and not in any "line-up" as the man who had assaulted or accosted them respectively was properly admitted at his subsequent trial therefor where it appeared that the identification was conducted after consultation with and in the presence of his attorney and before the defendant was placed under arrest.   [560]

Participation by the judge at the trial of an indictment in the questioning of a witness in order to clarify her testimony was not prejudicial to the defendant.   [560]

At the trial of an indictment for assault with intent to commit rape upon a girl who struggled with her assailant, there was no prejudice to the defendant in permitting a police officer to testify that, when he was with the girl but not the defendant at the scene of the episode, she picked up a hair clasp and said "That is mine.   It was knocked off in the struggle." [561]

At the trial of indictments against a man for accosting a girl riding a bicycle near a country club and for assault with intent to commit rape upon another girl riding a bicycle behind a school about a half hour later on the same day, identification of the defendant in open court as the accoster and the assailant, together with the victims' accounts of the events and other evidence, warranted guilty verdicts notwithstanding alibi testimony by the defendant and his father.   [561]

Where it appeared at a trial under G. L. c. 278, §§ 33A–33G, as amended, of an indictment for assault with intent to commit rape that there was already probable cause for the defendant's arrest at the time a police sergeant went to his house and told him of the victim's complaint and requested him to go to the police station, that at the station the defendant, not under formal arrest, was identified by the victim in the presence of the defendant's lawyer, and that the defendant was silent when identified, the judge should not have charged the jury at all with respect to admission by silence, and patent and prejudicial error by reason of the charge on that subject resulted in a substantial risk that the jury were misled and that there was a miscarriage of justice, and, although the defendant did not take any exception to the charge, a conviction was set aside and a new trial ordered.   [561–564]

INDICTMENTS found and returned on November 4, 1965.

The cases were tried in the Superior Court before *Beaudreau, J.*

*James L. Haley* for the defendant.

*Aaron K. Bikofsky,* Assistant District Attorney (*Ruth I. Abrams,* Assistant District Attorney, with him), for the Commonwealth.

CUTTER, J. In November, 1965, Freeman was indicted (a) for assault on September 24, 1965, with intent to commit rape and (b) for accosting or annoying a female "with offensive and disorderly act or language" on that day. He was found guilty on both indictments, after a trial in January, 1966, under G. L. c. 278, §§ 33A–33G, as amended. The accosting indictment was placed on file. Freeman was sentenced to the Massachusetts Correctional Institution, Walpole, for not more than ten or less than six years. The evidence is stated in its aspect most favorable to the Commonwealth.

About 5 P.M. on September 24, 1965, a girl fifteen years old (Catherine) was riding her bicycle near the Maynard Country Club. She had stopped because of traffic. A "greenish-blue" automobile pulled up near her. The driver was a man with "mussed" hair, wearing a dirty green work shirt, whose appearance was "very dirty and greasy." He spoke to Catherine and asked her if she "really wanted to go home." As she started riding, he shouted a question at her, "What size are your breasts?" She was "shocked and terrified" and "pedaled home." Her mother called the Maynard police.

About 5 : 30 P.M. on the same day a seventeen year old girl (Marilyn) was riding her bicycle behind the Merriam School in Acton. A "boy" drove up in a "bluish green compact" automobile and came over to her. His description was closely like that of the man who had accosted Catherine.

He asked some questions about her school activities. Then he grabbed her by the wrist, pushed her to the ground, "was on top of . . . [her] about two or three minutes,"

and "felt of . . . [her] breast." He picked her "off the ground and dragged . . . [her] into the woods." She screamed. He told her to take off her clothes and, when she said, "No, I won't," he said, "I'll do something to you." She took off her "dungaree shorts" and sweat shirt. He pushed her to "the ground and . . . ripped . . . [her] underpants off." His conduct was grossly offensive. He, however, did not attempt to have intercourse with her. He then told her to put her "clothes back on." She asked if she "could get out of the woods because . . . [she] was afraid." He "went to his car, and . . . [she] went to . . . [her] bike." They both left the scene and she went home. She promptly complained to a friend and to her mother. Marilyn's parents called the Acton police.

There was substantial evidence that some person had struggled with Marilyn near the school. She had bruises and injuries, her clothing was torn, and there were broken branches of trees at the scene. The principal issue at the trial was the identity of Marilyn's attacker.

Officer Harrison, an off-duty Acton policeman who had known Freeman for several years, testified that he had seen him about 5 P.M. in a "bluish green" compact automobile talking with a girl holding a bicycle near the Maynard Country Club on September 24. He identified the girl as Catherine. Officer Roche of the Acton police testified that at 5 P.M. on September 24, he, while parked near the Maynard-Acton line, had seen Freeman driving a "green" compact sedan coming from the direction of the school and heading south toward Maynard. He had known Freeman for nine years. On September 24 during the day, Freeman was in fact wearing a green work shirt and grey pants. Because of his work his clothing was somewhat dirty. That afternoon he had been driving his mother's "green" compact automobile.[1]

---

[1] Freeman, himself then twenty-two years old, and his father (to the extent he had knowledge) gave the following account of events. On September 24, Freeman drove his father (who was on his way to New York) in a green compact automobile twenty-two miles from his house in West Acton to a bus

Commonwealth *v.* Freeman.

Both Catherine and Marilyn identified Freeman at the trial. Earlier they had each picked out his picture in a high school yearbook shown to them by the police. They each also identified him at the Acton police station in the circumstances described below.

About 10:20 P.M. Sergeant Fenton of the Acton police called Freeman and asked him to go to the police station. About thirty minutes later, Sergeant Fenton went to the Freeman house, told Freeman of the two girls' complaints, and requested him to go to the police station so that the girls could have a look at him. Freeman or his fiancée, who was with him during the evening, called his lawyer, Mr. Haley, who arranged to go to the police station with Freeman.

At the police station Mr. Haley objected to Sergeant Fenton's proposal that the two girls view Freeman from behind a one-way mirror. Sergeant Fenton said, "We'll do it any way you want." Freeman was then seated at a table in the front office. Also present in the room were four police officers, Mr. Haley, and, a few feet away from Freeman, his fiancée. Freeman was not in any sort of "lineup." Officer Roche testified that Freeman then was not under arrest. One at a time, the girls were brought to the doorway, some ten to twenty feet from Freeman. Catherine was asked if this was the person who had spoken to her, and she nodded her head, meaning "yes," and perhaps said "yes." Marilyn when asked, "Is that the man?" nodded and said, "Yes," or "That's the man." Freeman's fiancée testified that she heard Marilyn's answer, but Freeman denied hearing that answer. In answer to questions put by Freeman's attorney on cross-examination, sev-

station near the Riverside station in Auburndale. He left his house about 3:40 P.M. and arrived at Riverside about 4:15 or 4:20 P.M. Freeman's father then boarded the New York bus. Freeman himself left Riverside about 4:32 P.M. and returned to his house at West Acton, after a five minute stop en route, and reached his house about 5:25 P.M. He called his fiancée by telephone about 5:30 P.M. and joined her at her house about 5:50 P.M. He denied having stopped that afternoon near the Maynard Country Club or the Merriam School. He saw Officer Roche in his parked automobile and waved to him while on his way to his fiancée's house.

eral witnesses testified to the fact that Freeman said nothing at all when the girls identified him as the man who had accosted or molested them. The police did not then place Freeman under arrest, but told him that they would bring formal charges against him the next day.

Freeman's assignments of error, so far as not waived, relate principally to testimony concerning the alleged identification at the Acton police station and the portion of the judge's charge concerning the identification. He also presses an exception to the denial of his motions for directed verdicts of acquittal.

1. Testimony concerning the identification of Freeman by the two girls was admissible. *Commonwealth* v. *Locke,* 335 Mass. 106, 112. *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 497. See *Commonwealth* v. *Palladino,* 346 Mass. 720, 722–723. Although the use of fair line-ups is commendable police practice, we need not consider the extent to which other types of identification may or may not be proper. This identification was conducted in the presence of Freeman's attorney and it could reasonably be found that he consented to the method employed. Indeed, it seems likely that the police would have followed any feasible, fair procedure suggested by Mr. Haley, if he had made a suggestion. We perceive no unfairness on the part of the police or prejudice to Freeman. The case, because of the presence of Freeman's attorney, is wholly unlike *United States ex rel. Stovall* v. *Denno,* 355 F. 2d 731 (2d Cir.), cert. granted 384 U. S. 1000.

2. That the judge participated in questioning Catherine concerning her identification of Freeman at the police station, presumably in order to clarify her testimony, was not prejudicial. *Commonwealth* v. *Oates,* 327 Mass. 497, 500. See *Commonwealth* v. *Lewis,* 346 Mass. 373, 378–380, cert. den. 376 U. S. 933. See also *Spindler* v. *United States,* 336 F. 2d 678, 682 (9th Cir.), cert. den. 380 U. S. 909; *United States* v. *Godel,* 361 F. 2d 21, 24 (4th Cir.). We perceive no exhibition of bias in the manner or form of his questioning.

3. Freeman was not prejudiced by the action of the judge in permitting Officer Roche to testify that, when he was with Marilyn and her parents at the scene of the episode near the Merriam School, she bent over and picked up a hair clasp, and said, "That is mine. It was knocked off in the struggle." This at most merely tended to identify the hair clasp as belonging to Marilyn and to fix the place of the struggle. It had no tendency to connect Freeman with that struggle or with Marilyn.

4. The evidence amply permitted the trial judge to submit the case to the jury and warranted his denial of the motions for directed verdicts. The jury were not required to believe that Freeman was not at the scene of the offences or (see fn. 1) that he parted from his father at the Riverside bus station as late as 4:32 P.M. The distance from there to the Maynard Country Club was not so great as to preclude Freeman from reaching the club by 5 P.M. in any event. The identification of Freeman in open court as the accoster of Catherine and the assailant of Marilyn, together with their accounts of the events, warranted the verdicts. The weight of this testimony was for the jury.

5. No exceptions were taken to the judge's charge. It is pressed upon us, however, that, even in the absence of an exception, we should set aside the verdicts to prevent a miscarriage of justice because of the portion of the charge mentioned below. It is argued, in effect, that this portion of the charge involved prejudicially incorrect instruction on a decisive issue, the error in which was not raised at the trial. See *Commonwealth* v. *Conroy,* 333 Mass. 751, 756–757. See also *Commonwealth* v. *Smith,* 342 Mass. 180, 188–189.

The judge correctly instructed the jury that they could not consider the fact that Freeman called his lawyer before going to the police station. That, said the judge, "does not indicate guilt." He then referred to the circumstance that Freeman "was brought to the station voluntarily by his lawyer and . . . it was for the purpose of identification." Apparently with respect to Freeman's identification by the

girls, he said, "Now, you ask yourselves, 'Was the defendant in a position to hear what the officer said and . . . to hear or see what the witness did in response to the question?' " The judge then stated the rule concerning admissions by silence and his application of the rule, in the words set out in the margin.[2]

The judge should not have charged at all on admissions by silence with respect to the identifications at the police station. Freeman was then represented by a lawyer. We assume that Freeman was not under formal arrest, but he was in a situation where he was entitled to leave all talking to his attorney and where it was natural for him to do so. Most, if not all, of the reasons for refusing to receive evidence of a defendant's refusal to talk before consulting counsel or upon advice of counsel apply to the circumstances of this case. See *Commonwealth* v. *Sazama*, 339 Mass. 154, 157–159; *Commonwealth* v. *Burke*, 339 Mass. 521, 531–533. The basis for any application of the doctrine of admissions implied from silence (see Brody, Admissions Implied from Silence, Evasion, and Equivocation in Massachusetts Criminal Cases, 42 B. U. L. Rev. 46, 50–53) is that it would be natural for an innocent man to speak. That basis was absent where Freeman was in the presence of his lawyer. See for a recent case dealing with implied admis-

---

[2] "When a statement is made in the presence and hearing of a defendant which, if true, tends to show that he is guilty, and he remains silent or makes an equivocal reply, the rule is that a statement made in the presence of a defendant, to which no reply is made, is not admissible against him, unless it appears that he was at liberty to make a reply, and that the statement was made by such person and under such circumstances as naturally to call for a reply unless he intends to admit it. You might say in this case, 'Well, the defendant had his lawyer there, who was nearby, and he did not feel that he had to deny it at that time,' or you may take the rule that I have just cited. It depends on how you view this thing. But regardless of how you view it . . . the girl . . . identified him on the stand. You had her in front of you. You . . . weigh her testimony the way you see fit. . . . Apart from whether . . . the defendant replied or did not reply because . . . his lawyer was there, nevertheless, you look at the situation where he was. How far were they from him? Were they in a position to identify him at the time they allege they saw him and at the time they saw him in the station? At that time it is clear that he was not under arrest. He was brought in there and came in voluntarily. . . . When a person is under arrest, he is under no obligation whatsoever — whether he has a lawyer there or not — to deny or say anything. He can keep silent."

sions, *Commonwealth* v. *McCambridge,* 351 Mass. 516, 519–521. See also *Commonwealth* v. *McGrath,* 351 Mass. 534, 538–541. Cf. *Miranda* v. *Arizona,* 384 U. S. 436, 468, fn. 37 (decided June 13, 1966, and not here applicable); note, 52 Cornell L. Q. 335.

Even if Freeman's attorney had not been present, there is grave doubt whether his silence could properly have been regarded as possibly an admission. Freeman, to be sure, had not formally been placed under arrest when he went to the police station. There was, however, already probable cause for his arrest because he had been identified from his year book pictures by the two girls and because he had been observed in the green automobile near the scene and time of the offences by Officers Harrison and Roche. He was present at the police station by reason of at least some police pressure and it is hardly likely that he would have been permitted to leave.

Even where a jury is given proper instructions concerning the legal principles relating to admissions by silence, there is a substantial risk of misunderstanding and misapplication by a jury. Here the instructions were not correct.

Freeman's counsel should have brought to the trial judge's attention in specific terms the incorrectness of the charge. See *Bell* v. *Dorchester Theatre Co.* 308 Mass. 118, 123; *Sullivan* v. *Sullivan,* 333 Mass. 512, 514; *Thompson* v. *Graham,* 350 Mass. 777. An exception saved to the admission of Catherine's testimony about the identification was only vaguely related to the discussion in the charge and was not likely to cause the judge to consider the error now asserted. Nevertheless, on a matter which might materially affect the crucial issue of the identifications, the jury should have been instructed "correctly concerning principles that ought to . . . control their action." See *Horowitz* v. *Bokron,* 337 Mass. 739, 746. This court would have unanimously ordered a new trial if an exception had been saved, for the error was patent and prejudicial. The question is whether the error was of a type and seriousness which should lead us to reverse in the absence of a proper excep-

tion. The test is whether there is a substantial risk of a miscarriage of justice.

For much the same reasons which led us to set aside a conviction of youthful offenders in *Commonwealth* v. *Wallace,* 346 Mass. 9, 13–15, a majority of the court are of opinion that here there is substantial danger that the jury were misled by the erroneous instruction, and that the instruction may have materially influenced their appraisal of the identification testimony. Consequently, we employ the rarely used power referred to in *Commonwealth* v. *Conroy,* 333 Mass. 751, 756–757, so that there may be a new trial. Cf. *Commonwealth* v. *Crowell,* 347 Mass. 771; *Commonwealth* v. *Kiernan,* 348 Mass. 29, 33.

*Judgment reversed.*
*Verdict set aside.*