## COMMONWEALTH vs. FREDERICK A. LATOUR.

Essex. September 10, 1981. — October 22, 1981.

Present: HALE, C.J., BROWN, & GREANEY, JJ.

*Evidence,* Hearsay, Common criminal enterprise. *Joint Enterprise.*
  *Practice, Criminal,* Instructions to jury, Failure to save exception.

At the trial of a defendant for attempting to influence the vote of a city
  councillor through the payment of money, the judge did not err in ad-
  mitting evidence pertaining to a codefendant's solicitations of two
  other councillors where there was sufficient evidence to warrant a
  finding that the defendant and the codefendant had been engaged in a
  joint venture to influence the votes of all three councillors. [527-530]
This court declined to consider alleged errors in a judge's charge to the
  jury where no objection had been made to any part of the charge and
  there was no substantial risk of a miscarriage of justice. [530-531]

INDICTMENT found and returned in the Superior Court on
April 26, 1977.

The case was tried before *Doerfer, J.*

*Charles M. Burnim* for the defendant.

*Stephen J. Kiely,* Assistant District Attorney, for the
Commonwealth.

HALE, C.J. The defendant, Latour, and one Frederick
Goodman were indicted under G. L. c. 268 A, § 2, for at-
tempting to influence the vote of Lynn City Councillor
Robert Tucker in the election of a municipal officer through
the payment of money. Following a jury trial, which was
held in October, 1977, the defendant and Goodman were con-
victed and sentenced. Only the defendant has appealed.[1] He
claims that the trial judge committed a number of errors in

---

[1] Goodman was also indicted for attempting to bribe two other Lynn
city councillors in connection with that same election. He entered guilty
pleas to those indictments following his conviction on the indictment
stemming from the alleged offer of money to Tucker.

admitting evidence relating to Goodman's solicitations of two other councillors and also in his instruction to the jury. Before considering the claims of error, we summarize facts which could have been found by the jury from the evidence introduced at trial.

The charter of the city of Lynn provides for the election of the city treasurer and other municipal department heads by a majority vote of the eleven members of the city council. Some time in March or April of 1977, a vacancy occurred in the position of city treasurer. After receiving notice of the vacancy, the city council requested applications from qualified individuals. The defendant was among the approximately dozen applicants responding to the council's request.

At the time of his application for the position of city treasurer, the defendant was a teacher at Lynn Classical High School and was also a practicing attorney. In addition to teaching and practicing law, the defendant had been significantly involved in the city's political and civic activities both in the years prior to and at the time of his application. Among those activities were a term as a Lynn city councillor, an unsuccessful campaign for the office of mayor, and participation in a number of civic and municipal organizations.

At the time he applied for the position of city treasurer, the defendant was also engaged in a real estate venture with Goodman involving the rehabilitation of several Lynn rental properties. During the period between the defendant's application and the council's election of a new city treasurer on April 26, Goodman actively solicited votes on the defendant's behalf and closely cooperated with the defendant in planning his "campaign" strategy.

Goodman first discussed the defendant's candidacy for city treasurer with Lynn City Councillor Robert Tucker on the afternoon of April 21. During that conversation, which took place in Tucker's car, Goodman asked Tucker whether he was committed to any of the candidates seeking that position. After Tucker responded that he was not, Goodman asked Tucker to roll up the car window because he had

"something to tell him." Goodman proceeded to criticise one of the other candidates and to urge Tucker to support the defendant as a "personal favor." When Tucker stated that he had several difficulties with the defendant's candidacy (relating to the defendant's status as a former city councillor and his support of Tucker's opponent in Tucker's campaign for election to the city council), Goodman indicated that if Tucker voted for the defendant, the defendant would agree not to support Tucker's opponent in the next council election.

Following that offer of the defendant's political cooperation, Goodman turned the conversation to the subject of Tucker's campaign finances. In response to a question by Goodman, Tucker stated that his 1975 city council campaign expenses had run around $1,200 and that his 1977 bid for reelection would probably cost between $2,000 and $3,000. Goodman then made the following statement: "How much do you need — five hundred, a thousand, two thousand? I can have the money for you in two or three days. I don't want you to consider this a bribe." Goodman also informed Tucker that he could supply names and addresses pertaining to where the money would come from. Although Tucker did not respond to Goodman's offer, at the latter's suggestion, the two men agreed to meet with the defendant the following evening. Tucker reported that offer to the police.

The following evening Tucker met with the defendant and Goodman at a restaurant in Revere. During dinner there was an extensive discussion of the defendant's candidacy and the likelihood of his receiving Tucker's support. In the course of the discussion, and in the presence of the defendant, Goodman repeated his offer to give Tucker a thousand dollars if he would support the defendant. For his part, the defendant told Tucker that he already had four "solid" votes in the council.[2] Tucker was also urged to

---

[2] The defendant stated that he had the support of Councillors O'Brien, Coppola, DeJoie and Miles. There is no indication in the record that La-

speak to a fifth councillor, John O'Donnell, on the defendant's behalf.

The following Monday (April 25, 1977), Tucker received a telephone call from Goodman informing him that he could pick up the money at Goodman's house. Tucker went to Goodman's house the following afternoon and there received $1,000 in cash from Goodman. Tucker promptly turned this money over to the police.

The second city councillor approached by the defendant and Goodman in connection with the defendant's candidacy was John O'Donnell. O'Donnell was approached by Goodman on two separate occasions regarding his vote in the upcoming election. On both occasions Goodman discussed the possibility of providing O'Donnell with money if he would agree to support the defendant.

The first of the two meetings between Goodman and O'Donnell occurred several hours after an April city council meeting in which the council interviewed candidates for city treasurer. In that conversation, Goodman urged O'Donnell to consider the defendant for that position. After O'Donnell said that he was committed to another candidate, Goodman responded that if he thought that O'Donnell was the kind of person who would take money he would offer it. When O'Donnell indicated that he was not, Goodman did not pursue the matter.

Goodman did press the matter of money, however, on the following Sunday evening (April 24, 1977). He had invited O'Donnell to his house to watch a hockey game. At that time Goodman again brought up the subject of the defendant's candidacy. After a protracted discussion in which Goodman reiterated the defendant's qualifications and his interest in seeing the defendant elected and in which O'Donnell maintained that he was committed to another

tour had the firm support of any councillor other than O'Brien. In fact, there is evidence from which the jury could have concluded that Latour knew that neither Coppola or Miles was going to vote for him at the time he made the statement to Tucker.

candidate, Goodman offered O'Donnell a thousand dollars if he would support the defendant. O'Donnell rejected that offer. A short time later Goodman phoned the defendant and invited him to come to Goodman's house. The defendant arrived sometime after 11:00 P.M., and together he and Goodman continued their efforts to obtain O'Donnell's vote without success.

A third councillor spoken to by the defendant and Goodman was Joseph Gaeta. On the evening of April 25, the defendant took Gaeta to a restaurant in Lynn to discuss the defendant's candidacy. There the defendant asked Gaeta for his support in the council vote the following evening. When Gaeta indicated that he was committed to another candidate, the defendant informed him that Goodman wished to speak with him. The defendant then handed Gaeta a slip of paper containing Goodman's phone number.

Immediately after receiving the phone number from the defendant, Gaeta left the room to call Goodman. In the ensuing conversation, Goodman stated that he was interested in the candidacy of the defendant and would "do anything" to get the defendant votes for that job. When questioned as to what he meant, Goodman simply stated "fifteen." After Gaeta failed to respond, Goodman asked Gaeta to come to his house the following morning. That invitation was not accepted.

1. We consider first the judge's admission of evidence pertaining to Goodman's solicitations of Councillors O'Donnell and Gaeta. The defendant argues that the introduction of this evidence against him was erroneous because it was inadmissible hearsay. We disagree.

In raising this contention, the defendant recognizes that the admission of Goodman's statements against him would not be barred under the hearsay rule if those statements were made during and in the furtherance of a joint venture to which he was a party. The defendant's position in this regard is well founded, for it is settled law in this Commonwealth that a person is taken to adopt the acts and statements of his coventurer that are made in furtherance of

their venture. *Commonwealth* v. *Flynn,* 362 Mass. 455, 477 (1972). *Commonwealth* v. *Borans,* 379 Mass. 117, 146 (1979). In *Flynn* the Supreme Judicial Court recognized that this rule "is not confined to cases where a conspiracy is charged, but it is applicable wherever a combination to effect a particular object is established." *Id.* Hence, it applies to this case, even though the defendant was not charged with either conspiracy or a substantive violation of G. L. c. 268A, § 2, based on the solicitations of O'Donnell and Gaeta.

In an effort to escape the clear import of this exception to the hearsay rule, the defendant contends that there was no evidence from which the jury could have inferred the existence of a joint venture to influence the votes of all three councillors.[3] The evidence of the activities of the defendant and Goodman throughout the period in which they sought to obtain the appointment for the defendant and the defendant's extensive involvement in the events surrounding the O'Donnell and Gaeta solicitations run counter to that contention. The jury could reasonably have inferred the existence of an ongoing joint venture, designed to secure the defendant's appointment by offering money to Tucker, O'Donnell and Gaeta to influence their votes.

Even in his most optimistic moment (during the Friday night meeting with Goodman and Tucker in Revere), the defendant claimed to have the support of only four of the six

---

[3] The trial judge initially admitted Goodman's statements against the defendant subject to a motion to strike if the Commonwealth failed to introduce sufficient evidence of a joint venture to allow the question to go to the jury. When the Commonwealth subsequently sought to cross-examine Goodman concerning his solicitations of O'Donnell and Gaeta, the defendant objected. At this point, the trial judge made a preliminary finding that there was sufficient evidence in the record to permit the jury to find that the defendant and Goodman were engaged in a joint venture to influence the vote of Councillor Tucker. We do not believe that at that time the judge was obligated to make a similar finding as to the "broader" venture including Councillors Gaeta and O'Donnell, particularly in the absence of a request for a ruling on that point. See *Commonwealth* v. *Borans, supra* at 145, n.26.

councillors required for his appointment. Assuming the sincerity of that claim, he would still have had to obtain the support of at least one more councillor in addition to Tucker in order to be elected.[4] In light of the necessity for obtaining at least one — and perhaps three — additional votes and the substantial amount of money already invested in the defendant's candidacy as a result of the offer to Tucker, the jury could reasonably have found the existence of the broader scheme.

Moreover, the existence of such a scheme was also readily inferable from the defendant's involvement in the events surrounding the Gaeta and O'Donnell solicitations. As early as the Friday before the city council vote, the defendant and Goodman openly discussed in front of Councillor Tucker the need to obtain O'Donnell's support.[5] Shortly after O'Donnell rejected Goodman's offer the following Sunday night, Goodman called the defendant to his house in a further effort to persuade O'Donnell to support the defendant. Even though the defendant was not present when the actual offer of money was made, his awareness of the need to obtain O'Donnell's support, his timely appearance at Goodman's house, and his subsequent efforts to persuade O'Donnell would have allowed the jury to conclude that the defendant had knowledge of and, indeed, was intimately involved in a preconceived plan to bribe Councillor O'Donnell.

---

[4] As previously noted in the factual summary, there was evidence in the record from which the jury could have found that the defendant never believed that he had the support of Councillors DeJoie and Miles. The defendant's knowledge that he needed the support of three additional councillors to be elected makes all the more reasonable an inference that he and Goodman were prepared to make additional offers of money.

[5] In this same conversation, Goodman and the defendant indicated that they had previously agreed to divide up their efforts to obtain the support of O'Donnell and Gaeta. This conversation would demonstrate that Goodman and the defendant had carefully discussed their strategy in approaching both councillors and provided the jury with an additional basis for concluding that Goodman's solicitations of both O'Donnell and Gaeta were in furtherance of a joint venture in which the defendant participated.

Even more revealing were the events leading up to the solicitation of Councillor Gaeta. The defendant met with Gaeta to discuss the defendant's candidacy on the evening before the council vote. After Gaeta refused the defendant's request for support, the defendant informed Gaeta that Goodman wished to speak with him and handed Gaeta a card with Goodman's phone number on it. Gaeta complied with this request, and Goodman, without expressing any surprise that Gaeta was calling or any doubt as to the intended subject matter of their conversation, promptly made a statement that reasonably could be interpreted as an offer of money. That sequence of events permitted the jury to conclude that the defendant knew what Goodman was going to say to Gaeta and that he and Goodman were involved in an over-all scheme that included both the Gaeta and O'Donnell solicitations. Because it could be found that the statements at issue were made in the course of that larger scheme and were made directly in furtherance of it, the hearsay rule did not preclude the judge from admitting them in evidence against the defendant.[6]

2. Prior to the closing arguments, the judge asked counsel whether they wished to submit written requests for jury instructions. Although the defendant did not submit any written requests, he did ask the judge if the jury would be instructed on the limited purpose for which evidence of the O'Donnell and Gaeta solicitations had been admitted. The judge responded that he preferred not to comment in his charge on any specific evidence. The defendant apparently was satisfied with the reason the judge gave, as he neither pressed the matter nor made any objection.

When the judge completed his charge, the defendant requested that additional instructions be given on the presumption of innocence, on intent, and on the use of char-

---

[6] Our conclusion that the trial judge properly admitted evidence of Goodman's solicitations of O'Donnell and Gaeta because of the evidence of an over-all scheme makes it unnecessary to consider the Commonwealth's contention that this evidence was admissible even in the absence of an on-going joint venture that included the two other councillors.

acter evidence. The judge gave additional instructions on the question of intent, and the defendant indicated his satisfaction with them. The judge also explained why he believed that additional instructions on the other two points were unnecessary. Apparently, this explanation was satisfactory to the defendant, as he made no objection. Indeed, the defendant did not object to any part of the charge.

The defendant argues that the foregoing and other claimed errors concerning the judge's charge warrant reversal. As none of those assignments is based on an objection, we do not consider the alleged errors. *Commonwealth* v. *Foley*, 358 Mass. 233, 236 (1970). *Commonwealth* v. *Underwood*, 358 Mass. 506, 509 (1970). From our examination of the defendant's contentions and the charge to the jury taken as a whole (see *Commonwealth* v. *Godin*, 374 Mass. 120, 130 [1977]), we are satisfied that there is no substantial risk of a miscarriage of justice. See and contrast *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

*Judgment affirmed.*