# DECISIONS

OF THE

## APPEALS COURT

OF

## MASSACHUSETTS

COMMONWEALTH *vs.* ALBERT LeBLANC.

No. 90-P-396.

Suffolk. September 12, 1990. - January 24, 1991.

Present: WARNER, C.J., PERRETTA, & GILLERMAN, JJ.

*Controlled Substances. Cooperation with Government Agents. Entrapment. Practice, Criminal,* Instructions to jury, Conduct of government agents. *Evidence,* Failure to produce witness.

At the trial of an indictment for trafficking in cocaine, the judge's refusal to instruct the jury on the defense of agency created a substantial risk of a miscarriage of justice, where the defendant's sole defense was that he believed he was working for the government in arranging the sale of the cocaine. [6-7]

This court expressed the view that, upon retrial of a criminal case, questioning of the defendant on cross-examination with respect to an allegedly "missing witness" should be undertaken, if at all, with caution in light of *Commonwealth v. Zagranski,* 408 Mass. 278, 286-288 (1990). [7-8]

INDICTMENT found and returned in the Superior Court Department on February 26, 1988.

The case was tried before *Constance M. Sweeney,* J.

*Dana A. Curhan* for the defendant.

*Sandra L. Hautanen*, Assistant Attorney General, for the Commonwealth.

PERRETTA, J. Two State police officers testified at the defendant's trial that, in 1988, while conducting an undercover investigation of drug trafficking in Chelsea, they purchased cocaine from the defendant on January 12 (twenty-eight or more grams) and on February 12 (two hundred or more grams). At the scene of the second sale, the officers disclosed their true identities to the defendant and arrested him and his supplier, the codefendant at trial.[1] Testifying on his own behalf, the defendant claimed that the officers revealed themselves to him after he had agreed to arrange the first sale in January.[2] Rather than arresting him, they promised that they would try to "work something out" if he would cooperate and serve up his supplier. The defendant stated that he arranged the sales with the officers' knowledge, participation, and approval. The judge denied the defendant's request for an instruction which would have allowed the jury to consider whether the defendant, on February 12, was acting as the officers' agent and, instead, instructed on the defense of entrapment. Although the defendant failed to protect his right to appellate review of the instructions,[3] we conclude that the refusal to instruct the jury on the defense of agency created a substantial risk of a miscarriage of justice. We reverse the conviction.

1. *The evidence.* State police officer Paula Loud was the first to meet the defendant. She arranged the sale on January 12, 1988, and brought a "friend," Officer Raymond Auld, with her to the defendant's apartment in Chelsea.[4]

When Auld and Loud entered the defendant's apartment, another man was also there, but he left almost immediately. Now alone with the defendant, Loud and Auld got down to

---

[1]Libardo Agudelo, whose case is not before us.

[2]The indictment charging the January offense was severed for trial from the indictment arising out of the February transaction. This appeal concerns only the conviction for the February offense.

[3]Appellate counsel did not represent the defendant at trial.

[4]The Commonwealth's case was based mainly on Auld's testimony, corroborated and supplemented in details by Loud.

business. Auld began the discussion of his desire to purchase an ounce of cocaine, and negotiations ensued. They eventually agreed to a price of $1,300. The defendant explained that they would have to drive to his source's house and that they (Auld and Loud) were to remain in the car while he went inside to purchase the cocaine.

It took about fifteen minutes to reach the designated location, 235 Vane Street, Revere. Auld gave the money to the defendant, who then went inside. He came out about twenty-five minutes later, got into the car, and told Auld that he had the cocaine.

As they drove to the defendant's apartment, Auld asked whether the price would drop if he were to make a bigger purchase. The defendant told him that it would be cheaper were he to buy in larger quantities and that he should consider buying a kilogram. Auld suggested that he and the defendant make a joint purchase of a kilogram. The defendant said that a joint purchase would require further discussion.

When the three were back at the defendant's apartment, he removed a plastic bag containing white powder from his jacket. He went into his bedroom, measured the powder on a three-beam scale, and gave it to Auld. They went into the living room and continued their earlier discussion about buying a larger quantity of cocaine, a kilogram.

Having put the trap in place, Auld and Loud left the defendant's apartment. During the following three weeks, Auld spoke with the defendant several times, telling him that he was trying to raise the money for the large purchase.

On February 11, 1988, Auld went to the defendant's apartment and told him that he could raise $15,000. The defendant informed Auld that, with that amount of money, they could purchase a kilogram of cocaine. However, because the defendant did not have any money to contribute towards the purchase, he would, instead, want just a few ounces for himself. It was agreed that Auld would call the defendant that evening and meet him the next morning.

At about 9:45 A.M., February 12, Auld and Loud went to the defendant's apartment. Auld went inside while Loud re-

mained in the car with the money for the purchase. The defendant told Auld that the sale was set but that his supplier was late. After waiting for some time, Auld told the defendant that he was leaving and would return later.

Auld called the defendant six or seven times over the next few hours. Each time the defendant assured Auld that the sale would take place that day. At about 3:00 P.M., Auld and Loud returned to the apartment. Loud again remained in the car with the money, and Auld went inside the apartment. When Auld suggested that they postpone the sale, the defendant made a telephone call. He told Auld that they would have the drugs within fifteen minutes.

Almost to the minute, the codefendant Agudelo arrived at the apartment. He produced the kilogram, and Auld raised a window shade, the signal for the awaiting surveillance team to enter the apartment. As the officers came into the apartment, Auld identified himself and arrested the defendant. Loud arrested Agudelo.[5]

The defendant's version of the events conflicted with that of Auld and Loud. He described how he had met Loud in early November, 1987, when she came to his apartment, as arranged by an acquaintence of his, to buy a small amount of cocaine. He did not see or hear from her again until January 11, 1988, when she called, asking to buy more cocaine. The sale was arranged for the next morning, and the defendant acquiesced in Loud's request to bring a male friend with her.

When Loud and Auld arrived at the defendant's apartment on January 12, the defendant immediately suspected that they were police officers. His friend, who sometimes supplied him with cocaine and who was also present and suspicious, left almost as soon as Loud and Auld arrived. The defendant, however, was pacified by Auld's identification card showing that he was an employee of General Motors. It was

---

[5]When Agudelo arrived at the apartment, he was accompanied by a woman who was also arrested, indicted, and tried as the third defendant. The judge allowed that defendant's motion for a required finding of not guilty at the close of the evidence.

Auld's turn to become agitated when the defendant suggested that he and Loud wait at the apartment while he (the defendant) went out to get the cocaine from his supplier. Auld balked at parting with his money without the drugs.

The defendant then changed his mind about the sale and told Auld and Loud that he was no longer in the "business." He had been out of work due to a shoulder injury and was scheduled for surgery on February 2. After the operation, he intended to return to his family in Canada and recuperate. At hearing this statement, Auld and Loud looked at each other. Auld then told the defendant that he was under arrest and that he wanted to know the name of his supplier.

Fearful of incarceration, the defendant decided to bargain. He told Auld that before he would reveal the identity of his source, he wanted a "deal." Auld promised the defendant that if he cooperated, they would "work something out." Based upon this statement, the defendant made an assumption that if he helped Auld and Loud, he would not go to jail. In that way, he could have his operation and return to Canada.

Thus motivated, the defendant agreed to cooperate. He was then "unarrested" and brought the officers to Revere.[6] When, on January 12, but after the first sale, Auld asked about a larger purchase, the defendant told him that he could not arrange it until after his surgery.

Shortly after February 2, Auld called the defendant. He told Auld that he was recuperating. On February 11, Auld again called and told the defendant that he had $15,000 and that, with the defendant's help, he wanted to buy a large quantity of cocaine. Although the defendant had not dealt in large quantities before, he arranged for the delivery of a kilogram to his apartment for $19,000.

It did not strike the defendant as odd that he was arrested with Agudelo on February 12. Had it been otherwise,

---

[6]We think it reasonable to construe the defendant's testimony that on January 12 he was arrested and then "unarrested" to mean that the officers identified themselves to him, but because he agreed to cooperate and assist them, they did not continue with the legal formalities of an arrest.

Agudelo would have known that he had assisted the police. Indeed, after his arrest, and when he was briefly alone with Auld, he said to him, "I gave you a good deal, didn't I?" and Auld agreed. At the police station, Auld asked him how he was doing and told him, "Just hang tight."

As put by the defendant, he has "been holding tight since then." He claims that, but for his arrest on January 12, he would not have bought cocaine that day nor would he have arranged the February sale.

2. *The jury instructions.* In charging the jury, the judge made no distinction in her instructions between the defendant and Agudelo. Having denied the defendant's oral request for an instruction on agency, she charged on the defense of entrapment as to both participants. "The defense of entrapment is appropriately raised . . . by the introduction of some evidence of inducement by a government agent or one acting at his direction." *Commonwealth* v. *Miller*, 361 Mass. 644, 651-652 (1972). Agency, on the other hand, comes into play where a defendant puts before the jury the question whether he honestly and in good faith believed that he was working for the government. See, e.g., *United States* v. *Tibbs*, 442 F.2d 423 (4th Cir. 1971).

It was the defendant's theory of defense that he was entrapped by Auld and Loud on January 12, 1988. To avoid the consequences of their successful ploy, he obtained cocaine for them, as their agent, later that day and again on February 12. While it is perhaps possible that the two defenses, entrapment and agency, might overlap, that was not the case as to the February sale, the only transaction before the jury. See note 2, *supra*. As to that sale, the defendant's sole defense was agency.

Although Agudelo received the benefit of the instruction on entrapment by reason of the defendant's claimed cooperation with the police, that instruction could have been more harmful than beneficial when applied to the defendant. In her instructions on entrapment, the judge made it clear to the jury that the defense was unavailable to a person who has a predisposition to commit the crime under considera-

tion. See *Commonwealth* v. *Miller*, 361 Mass. at 651, quoting from *United States* v. *Groessel*, 440 F.2d 602, 605 (5th Cir.), cert. denied, 403 U.S. 933 (1971) ("no entrapment exists 'if the accused is ready and willing to commit the crime whenever the opportunity might be afforded'"). Here, the defendant readily admitted to his willingness to arrange the February sale. However, he steadfastly denied any intent to commit a crime and insisted that he was acting with and for Auld and Loud to snare Agudelo.[7] The jury should have been informed that, if they believed the defendant, he would be entitled to an acquittal. See *Commonwealth* v. *Baker*, 155 Mass. 287, 291 (1892); *Commonwealth* v. *LaBonte*, 25 Mass. App. Ct. 190, 196 (1987); *Commonwealth* v. *McMiller*, *ante* 392, 408 (1990). See also Perkins, Criminal Law 1170 (3d ed. 1982). The omission of such an instruction took from the defendant consideration of his entire defense by the jury, that is, whether on February 12 he honestly and in good faith believed that he was acting at the direction of and as an agent for the police.

We recognize that the defendant's request for such an instruction came late and in less than helpful terms. Further, the defendant made no objection to the instructions as given or refused. However, taking the charge as a whole and reviewing it with the evidence presented, we conclude that the refusal to instruct the jury on the defense of agency was error giving rise to a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

3. *The missing witness.* As earlier noted, when Auld and Loud arrived at the defendant's apartment on January 12, they encountered a man who left immediately. The defendant testified that this man was the same person who had

[7]The jury returned their verdict against Agudelo in a little less than three hours. They had not, however, reached a verdict as to the defendant, and they were excused for the weekend. Prior to renewing their deliberations the following Monday morning, they asked the judge for "another explanation of reasonable doubt and entrapment." The judge repeated her earlier instructions on those points. About five and one-half hours later, the jury returned with their verdict.

brought Loud to his apartment in November, 1987, and who sometimes supplied him with cocaine. There is nothing in the record to suggest that this person has information, favorable or otherwise to the defendant, concerning the cocaine sales on January 12 and February 12. Although we see no risk of a miscarriage of justice in the prosecutor's brief questioning of the defendant as to the whereabouts of this person at the time of trial, we also fail to see any purpose in the questions.

We cannot anticipate what will occur at retrial. It should be noted, however, that for the reasons most recently discussed in *Commonwealth* v. *Zagranski*, 408 Mass. 278, 286-288 (1990), "[t]his is a delicate area, requiring caution." *Id.* at 287. In view of the facts that the defendant's testimony inculpates this person in drug activity beyond the scope of the indictments concerning the January and February sales and that this person does not appear to have any personal knowledge of the two transactions, the admonition is especially applicable. See *Commonwealth* v. *Sena, ante* 463, 467-468 n.6 (1990).

4. *Conclusion.* The judgment is reversed, the verdict set aside, and the matter is remanded to the Superior Court for further proceedings.

*So ordered.*