COMMONWEALTH vs. JACOB REZNIKOW.

No. 00-P-738.

Middlesex. January 9, 2001. - April 12, 2001.

Present: PERRETTA, KAPLAN, & GELINAS, JJ.

*Child Abuse. Evidence,* Hearsay, Relevancy and materiality, State of mind. *Practice, Criminal,* Argument by prosecutor.

At the trial of indictments for sexual abuse of a child, fresh complaint testimony was properly admitted and, in any event, where counsel used the testimony in cross-examination and closing argument, the defendant waived objection to it. [333-334]

At the trial of indictments for sexual abuse of a child, the prosecutor's questions to the victim and another witness did not amount to an improper appeal to the jurors' emotions [334-335], and any superfluous rhetorical embellishments in the prosecutor's opening and closing did not warrant reversal of the defendant's convictions [335].

INDICTMENTS found and returned in the Superior Court Department on September 11, 1997.

The cases were tried before *Thayer Fremont-Smith,* J.

*Dana Alan Curhan* for the defendant.

*Edward C. Dorsey,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. A Middlesex Superior Court jury found the defendant guilty of rape of a child under the age of sixteen (G. L. c. 265, § 23) and indecent assault and battery of a child under fourteen (c. 265, § 13B). The defendant appeals from the judgments of conviction.

The complaining witness, Kristin (a pseudonym), was born on July 30, 1987. Her mother died some eighteen months later. Kristin and her twin brother remained with their father, the defendant herein, in a house in Billerica. There were many others who, over the years, from time to time, lived in the house.

Kristin was twelve years old when she testified at the trial in

October, 1999.[1] The period of abuse, according to Kristin, was from her third to her sixth year, 1990 to 1993. She said the defendant repeatedly, usually in afternoons, called her into his bedroom, shut the door, and had her take her clothes off. The defendant removed his clothes and lay on his bed next to her. Straddling her, he "would put his penis in my mouth and his penis on my vagina," in either case moving his penis up and down. During these incidents Kristin was "unhappy," "sad," "mad"; the defendant was "smiling," "happy."

Sometime in 1993, Eileen Scholl, the defendant's friend, came to stay in the Billerica house with her two grandsons, Patrick and James, then teenagers. Kristin said the defendant's abuse ceased with Scholl's arrival.

Kristin, however, began "acting out" in sexual ways, touching herself, her brother, and others, and speaking in sexually explicit words. Eventually, Scholl was led on June 21, 1995, to consult Harriet Otis, a licensed mental health counselor and family therapist practicing in Lowell. Otis met with Kristin on July 5, 1995. According to Otis, Kristin acknowledged she had been touching her brother and the Scholl grandsons. Then Otis asked whether someone had been touching her; Kristin said yes. The questioning continued: When had this happened? "[A] long time ago," and "more than once." Was it "still ongoing"? She said yes. Could she tell who it was? "No she couldn't." Did she feel safe at home? "No." Was she protecting "somebody" and was that the reason "she couldn't name them"? She answered "yes."

Otis promptly telephoned the Department of Social Services (DSS) and filed a "51A" report of suspected abuse. See G. L. c. 119, § 51A. DSS started an investigation. On July 11 a DSS social worker, Nancy Assemza, had a meeting with the defendant. He denied knowledge of any abuse; to the worker's mention of reports that Kristin had been acting out, he said he was not troubled by her behavior and was not aware of any misconduct. DSS later filed a care and protection petition in Juvenile Court which resulted in the placement of Kristin in

---

[1]Upon voir dire the judge decided Kristin was competent to testify.

foster care with Koshana DiTucci in the town of Byfield.[2] This occurred just before Kristin's eighth birthday in July, 1995. Kristin remained with DiTucci through the time of trial.

DiTucci testified. She observed at first hand Kristin's continuing acting out. At one point Kristin told DiTucci in general terms about having been abused, but she did not say who was responsible; talking about this came hard. Kristin used to communicate with DiTucci by handwritten notes. In August, 1996, Kristin handed DiTucci a note, but with the caution that it was not to be read until Kristin was back in her own room. The note said, "It was Daddy," and was signed "Sweetie Pie" (her nickname). Kristin would not speak of this note, but later, in August or September, she made two drawings of stick figures, depicting the "things that my Dad did to me."

DiTucci acquainted Eileen Hiatt, a psychotherapist who was seeing Kristin at the time, with these drawings. In a therapy session with Hiatt, Kristin made two new drawings showing "what the touchings were." Below the two figures in one drawing, Kristin had written "my private part and daddy private part are together." On the other drawing, also of two figures, Kristin wrote, "Has [*sic*] private part is in my mouth and I do not like it." And during a session on September 9, 1996, after Hiatt asked if anyone had touched her private parts, Kristin wrote "yes," and when further asked who it was, she wrote "daddy."

The Middlesex County district attorney's office took hold. On November 26, 1996, in an interview with Detective Sergeant Daniel Rosa of the Billerica police, Kristin named the defendant as the one who had abused her. On February 13, 1997, Sergeant Rosa spoke with the defendant. After Miranda warnings, the defendant denied abusing his daughter and said DSS workers had been "coaching" her. About a week before the trial Rosa tried to speak with Scholl but she declined to meet him.

The foregoing in substance was the Commonwealth's case.[3]

The defendant testified, denying the charges and pointing to

---

[2]The judge instructed the jury to give no weight to any decision by DSS and said the start of care and protection proceedings is based on "suspicion."

[3]Besides Kristin, testifying for the Commonwealth were Harriet Otis, Nancy Assemza, Cindy Preston (another DSS social worker), Koshana DiTucci, Eileen Hiatt, and Daniel Rosa.

the improbability of his being at home in afternoons: his schedule as a truck driver in the asphalt paving business would interfere.[4] Through cross-examination of Commonwealth witnesses, the defense had tried to show Kristin was progressively led into believing what she now asserted. Dr. Wilfred Derby, a clinical and forensic psychologist, testified for the defense as an expert about children's memories, research into suggestiveness of interview techniques, and susceptibility of young children to suggestion by adults. DSS had referred Kristin to a therapist, Vicky Glatt, for sexual abuse evaluation. Glatt interviewed Kristin in March, 1999, and testified the girl was weak in recollecting details of the abuse but had confirmed it occurred up to the time of Scholl's arrival and, Kristin said, more than once a week.[5]

The defendant does not dispute there was sufficient evidence to support the jury verdicts, for he does not claim the judge erred in denying the defendant's motions for required findings.

1. The defendant objected at trial to the admission of Otis's "fresh complaint" testimony on the ground that, as a matter of law, it was unduly prejudicial and cumulative of Kristin's testimony, and it was not fresh enough, not close enough in time to the supposed criminal behavior (a distance of perhaps two years). The objection was properly overruled.[6]

On appeal, the defendant changes stance and fixes on those words in Otis's testimony in which she reported that Kristin affirmed in response to questions that the "touching" (of Kristin as object) was "still ongoing" (at the time of the interview). There is argument that this particular hearsay could not be justified as fresh complaint material because it went beyond (and

---

[4]Lawrence Quinn, the defendant's employer, said the defendant worked normally from 8:00 A.M. to 4:00 or 4:30 P.M. at the earliest, and had not missed a day. The defendant said the work was seasonal and typically he would be laid off at Christmas.

[5]Witnesses for the defense besides those already noted were George Johansen and Judith Binette, both of whom lived at the Billerica house within the period of the alleged abuse.

[6]In prosecutions for sexual abuse of children "the tolerance of what is fresh complaint has become quite extended in recognition of the child's fear, repression, threats of coercion, psychological control by the abuser, or lack of understanding of what happened." *Commonwealth* v. *Nurse*, 50 Mass. App. Ct. 36, 39 (2000).

could be read as contradictory to) Kristin's direct percipient testimony about the duration of the criminal events; thus it could not serve in a corroborative role, and so should be excluded as unemancipated hearsay. We need not debate whether the nominal excess in Otis's narrative of her interviews with Kristin was so broad as to require exclusion. Compare *Commonwealth* v. *Flebotte*, 417 Mass. 348, 351-353 (1994) (error to admit excess); *Commonwealth* v. *Kerr*, 36 Mass. App. Ct. 505, 507-508 (1994) (same); *Commonwealth* v. *McCaffrey*, 36 Mass. App. Ct. 583, 585-589 (1994) (same), with *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 444-445 (no error), cert. denied, 519 U.S. 1015 (1996); *Commonwealth* v. *Martins*, 38 Mass. App. Ct. 636, 638-639 (1995) (same). The defendant lodged no objection on that basis and — if there was error — the question is the residual one how the testimony probably sat with the jury and could bear on the verdicts: could its admission have worked to create "a substantial risk of a miscarriage of justice" within the rule of *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). It would be hard to trace any probable effect adverse to the defendant. The defendant was not mentioned or pointed to as one who engaged in these later "touchings." Indeed, the defense seized upon the very testimony and in cross-examining Otis, and again in the closing speech to the jury, suggested that it was the grandchildren (according to Otis, Kristin said they "torture me") or others living or bivouacking in the Billerica house who might in fact have been responsible for the touchings or other abuse, not only in the later years, but in the critical three years. By thus using the supposed hearsay the defendant forfeits any right to protest its admission. "Having made that decision at trial, he cannot change tactics on appeal." *Commonwealth* v. *Merola*, 405 Mass. 529, 539 (1989). Finally, the direct evidence, verbal and pictorial, about the defendant's criminal behavior up to Kristin's sixth year appears solid and convincing no matter what plausible view is taken of the particular questioned testimony by Otis.

2. The defendant complains that the prosecutor entered "on a number of areas calculated to appeal to the jurors' emotions."

*a.* The prosecutor asked Kristin (over objection) how she felt about what had happened with her father. This was part of the

Commonwealth's legitimate purpose to show Kristin's ragged and reluctant state of mind,[7] which helped to explain her difficulty and delay in confiding to outsiders, and to rebut criticism that her testimony was a manufactured product of suggestion.

So also the defendant objected to the prosecution's questions to Eileen Hiatt about Kristin's body language or demeanor and her manifestations of shame during a therapy session. The inquiry was, again, directed to meeting the defendant's suggestion that Kristin was "coached."

*b.* The defendant did not object to the prosecutor's opening or closing speech to the jury, but now complains about some lush prose in each. The prosecutor said in his opening Kristin "lost her father and her brother," "lost her innocence," "lost her ability to [trust] anybody," and she would tell the jury "incredibly embarrassing" and "humiliating" details of the abuse and her own behavior. In the closing, the prosecutor said the latter forecast came true in Kristin's actual testimony. He called her drawings "[d]isturbing, disgusting, despicable" and characterized the crimes charged as, next to murder, "the most serious."

The rhetorical embellishments were superfluous and unsuitable, but it must be owned they did not much depart from or aggravate the sordid realities. We may suppose that sober jurors would not lose their common sense, seduced by this veneer, especially when they were reminded on several occasions by the judge what attitude they should take toward the exhortatory speeches of counsel.

We conclude, on the whole record, that the prosecutor's indiscretions, such as they were, do not call for reversal under the *Freeman* rule.

*Judgments affirmed.*

---

[7] The prosecutor also put questions to Kristin about her state of mind ("tired of answering questions") both on the stand and when she was interviewed by the therapist, Vicki Glatt. The questions provided context for Kristin's performance in the interviews and in cross-examination by defense counsel.